COLORADO COURT OF APPEALS                                    **2016COA94**

Court of Appeals No. 15CA0278
Adams County District Court No. 13CR3552
Honorable Thomas R. Ensor, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Wesley Faussett,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE DAILEY
Taubman and Freyre, JJ., concur

Announced June 16, 2016

Cynthia H. Coffman, Attorney General, Brian M. Lanni, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Leslie A. Goldstein, Alternate Defense Counsel, Steamboat Springs, Colorado,
for Defendant-Appellant

¶ 1     Defendant, Wesley Faussett, appeals the judgment of conviction entered on a jury verdict finding him guilty of aggravated motor vehicle theft in the first degree.  We affirm.

## I.     Background

¶ 2     Defendant's conviction arose out of a theft of a Honda PCX150 scooter from a residential parking lot.

¶ 3     Four days after the scooter was reported missing, police located a stolen pickup truck parked outside an apartment complex.  With the use of GPS surveillance technology, they were able to follow the pickup and the individual operating it (the driver) as he drove the pickup to various places, including a storage unit, and ultimately arrested him.

¶ 4     Later, police discovered that the driver was "possibly involved" with the disappearance of other vehicles besides the pickup.  While in custody, the driver made several phone calls to defendant and the driver's girlfriend (the girlfriend).  During these calls — which were monitored by the police — the driver talked to both defendant and the girlfriend about disposing of or selling the "bike" or "scooter."

¶ 5 Defendant was arrested for his involvement in the scooter's theft. At trial, the prosecution presented the following evidence:

- On the day the scooter was stolen, the girlfriend rented a storage unit at the facility to which police had followed the driver in the pickup.

- The day after the scooter was stolen, the driver sent a text message to defendant saying, "[y]a, its [sic] a Honda PCX 150."

- Inside the girlfriend's storage unit, police found the stolen scooter's license plate.

- Photographs captured from video surveillance footage obtained from the storage facility showed "three parties, what looks like moving a scooter, a motorcycle, into the back of a pickup" within weeks of the driver's arrest.

- The storage facility's manager testified that, the day after the video surveillance footage recorded three parties moving a "scooter" or "motorcycle" from the unit, defendant told her he broke the lock on the storage unit.

- The girlfriend testified that defendant told her that "he went to remove the bike" from the storage unit, to which

only he and the driver had a key, and damaged the unit's lock in the process.

¶ 6    Defendant presented no witnesses or evidence on his behalf; he asserted, however, that the prosecution's case against him was merely "[s]peculation, conjecture, [and] surmise."

¶ 7    The jury found defendant guilty as charged, and the trial court sentenced him to six years in the custody of the Department of Corrections and three years' parole.

## II.    *Denial of Continuance*

¶ 8    Defendant first contends that the trial court erred in denying his motion for a continuance. We disagree.

¶ 9    A week before trial, defense counsel moved for a continuance, as pertinent here, on two grounds: (1) the prosecutor had re-interviewed the girlfriend and defense counsel wished to review a written report of the interview, once it had been completed; and (2) defense counsel had never met defendant outside of court to discuss the trial, and defendant had just that morning "mentioned

3

additional witnesses that should be interviewed and possibly subpoenaed."[1]

¶ 10    The prosecution responded that it "did have conversations with the [girlfriend] . . . [b]ut it is consistent with what's in discovery" and not "anything exculpatory or really ground shattering . . . ."  On defendant's other ground, the prosecution did not comment.

¶ 11    The trial court ultimately denied defendant's motion for a continuance.  First, it noted that, without any indication that the girlfriend had said something "relevant and important" to the prosecution, "the other side [does not] automatically get[] a chance to continue the matter" just because the prosecution re-interviewed her.  Concerning "defendant's noncooperation," the trial court stated, "[T]hat's his business. . . .  [H]e made a choice. . . .  If he decides not to talk to his attorney, I know that puts his attorney in

---

[1] In the trial court, defense counsel asserted a third ground for a continuance: that morning, the prosecution provided defense counsel with new discovery, i.e., video surveillance footage of the storage unit that contained the motor scooter.  The videotape, which was not admitted at trial, was the source of the still photographs that were admitted without objection at trial.  Because defendant appears to abandon on appeal this third ground for a continuance, we do not address it.  *See People v. Brooks*, 250 P.3d 771, 772 (Colo. App. 2010).

4

an exceedingly difficult situation. . . . But her client has to take the case seriously . . . ."

¶ 12   We review a trial court's denial of a motion for a continuance for an abuse of discretion. *See People v. Alley*, 232 P.3d 272, 274 (Colo. App. 2010). "A trial court abuses its discretion in denying a motion to continue if, under the totality of the circumstances, its ruling is manifestly arbitrary, unreasonable, or unfair." *People v. Smith*, 275 P.3d 715, 721 (Colo. App. 2011) (quoting *People v. Mandez*, 997 P.2d 1254, 1265 (Colo. App. 1999)).

¶ 13   "No mechanical test exists for determining whether the denial of a request for a continuance constitutes an abuse of discretion. Rather, the answer must be found within the circumstances of each case, particularly in the reasons presented to the trial judge at the time of the request." *People v. Roybal*, 55 P.3d 144, 150 (Colo. App. 2001). To obtain a reversal, a defendant must also show he or she was actually prejudiced by the denial of the continuance. *Alley*, 232 P.3d at 274.

¶ 14   Here, we perceive no abuse of discretion or prejudicial error committed by the trial court.

¶ 15　　With respect to defendant's first ground for requesting a continuance, there was no suggestion either at the time or later, when the defense received a written report of the prosecution's interview of the girlfriend, that she had said anything new or different from what she had previously said.  *See People v. Rivers*, 727 P.2d 394, 399 (Colo. App. 1986) ("Because no new information was unearthed . . . , the trial court did not abuse its discretion in denying defendant's motion for continuance.").  Indeed, defense counsel notified the court that she "had an opportunity to speak at length" with the prosecution about the content of the interview.  And, during cross-examination, defense counsel specifically referenced the additional interview and questioned the girlfriend about particular statements she made to the prosecution at that time.  Thus, we are not persuaded by defendant's assertion on appeal that "in order to adequately prepare for trial and to cross-examine [the girlfriend], the continuance was necessary."

¶ 16　　With respect to defendant's other ground for requesting a continuance, as we read the record, any lack of communication between him and his counsel was the result of defendant's own

6

actions,[2] for which the court need not grant a continuance.  *See*

*Johnson v. People*, 172 Colo. 72, 80, 470 P.2d 37, 42 (1970) (finding

no abuse of discretion in the trial court's denial of a continuance

where "the defendant had, at first, refused to cooperate with [his

counsel]," leaving "[n]o real justification for the [continuance]" when

the defendant asserted he was not prepared for trial); *People in*

*Interest of J.T.*, 13 P.3d 321, 322 (Colo. App. 2000) (finding no

abuse of discretion in the trial court's denial of a continuance on

the eve of trial where "[the defendant] was responsible for not

making himself available to his attorney"); *see also People v.*

*Jenkins*, 997 P.2d 1044, 1138 (Cal. 2000) (affirming denial of

continuance sought because of the defendant's "persistent failure

. . . to cooperate with counsel").

¶ 17     Further, the defense made no offer of proof regarding what

substantive testimony defendant expected from the additional

witnesses, let alone who they were.  *See United States v. Johnson*,

977 F.2d 1360, 1366 (10th Cir. 1992) ("[W]hen a continuance is

sought to obtain witnesses, the accused must show who . . . [the

---

[2] Defense counsel informed the court that she had "made [her]self available to [defendant] on a number of occasions."

witnesses] are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and that due diligence has been used to obtain their attendance on the day set for trial." (quoting *United States v. Harris*, 441 F.2d 1333, 1336 (10th Cir. 1971))); *cf. People in Interest of N.F.*, 820 P.2d 1128, 1133 (Colo. App. 1991) (noting where counsel makes no offer of proof as to what the witness's testimony would have been, the reviewing court will not consider the alleged error to be prejudicial if it cannot determine from the record how the exclusion of evidence harmed the defendant's case).

¶ 18 Under these circumstances, we perceive no error in the court's exercise of discretion to deny a continuance on these grounds.

### III. Conflict of Interest

¶ 19 Defendant contends that "the trial court erred in failing to conduct an adequate inquiry [into the deteriorated relationship between him and his counsel] and further, should have appointed conflict-free counsel to represent [him]." We are not persuaded.

¶ 20 "When a defendant objects to court-appointed counsel, the trial court must inquire into the reasons for the [defendant's]

8

dissatisfaction." *People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006). If the defendant establishes good cause (e.g., a complete breakdown in communication, a conflict of interest, or an irreconcilable conflict that could lead to an apparently unjust verdict), the court must appoint substitute counsel. *Id.* However, before the substitution of counsel is warranted, the court must confirm that the defendant has "some well[-]founded reason for believing that the appointed attorney cannot or will not competently represent him." *Id.* (quoting 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 11.4(b), at 555 (2d ed. 1999)).

¶ 21 Here, defendant asserts that a substitution of counsel was warranted by a conflict of interest that he had with his appointed counsel. But before the trial court, defendant did not move for a substitution of counsel, nor did he voice any objection to or dissatisfaction with counsel. Indeed, defendant said nothing to the trial court about any concerns he had, if any, with counsel. Having expressed no dissatisfaction with counsel, he was not entitled to have the court make any inquiry, much less provide him with different counsel.

¶ 22    Yet on appeal, defendant argues otherwise, asserting that the court was obliged to sua sponte make inquiries where the record demonstrated a conflict of interest arising from a "deteriorated" relationship or counsel's insistence that defendant plead guilty contrary to defendant's wishes.

¶ 23    Defendant's assertions are not supported by the record.  With respect to the deterioration, it was defense counsel, not defendant, who indicated that they had had limited communication, and even then, only to suggest that she needed a continuance to adequately represent him:

> [Defendant] and I have not met one time outside of court on this matter.  When we appeared for the motions hearing, a new offer was extended to [him]. . . .  I did speak with -- by phone with [him] about that.  And he ultimately rejected the offer.  I have made myself available to [defendant] on a number of occasions.  I have made discovery available to him, and here we stand a week before trial and we've never once reviewed this discovery together, old or new.
>
> I am fearful of my ability to present an adequate defense for [defendant] *without his assistance.*  Having gone through again with him this morning what the discovery contains, . . . he does believe that he can provide some information that would be helpful for me. . . .

> And so, . . . I am asking for a continuance of this matter. . . . *He is willing* to waive [his] right [of speedy trial] in order *to assist me* in preparing his defense.

(Emphasis added.)

¶ 24    The type of "total breakdown" in communication which would warrant substitution of counsel must be evidenced by proof "of a severe and pervasive conflict with [the defendant's] attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002). Such a "total breakdown" is not evident from the record. To the contrary, defense counsel stated that she had discussed a possible plea agreement with defendant by phone and had made herself and the discovery available to defendant on multiple occasions. And, if anything, defense counsel's statements provided hope that the attorney-client relationship could improve because she said "[defendant] believes that he can provide some information that would be helpful" and "he is willing . . . to assist [counsel] in preparing his defense."

¶ 25    With respect to defendant's assertion that "defense counsel was insistent upon [defendant] accepting a plea bargain," the record

reflects only that (1) an offer was extended to defendant; (2) he and defense counsel spoke about the offer by phone; and (3) "[defendant] ultimately rejected the offer." Nothing in the record suggests defense counsel did anything but "accept this decision and provide the best defense possible," to which defendant says he was entitled. *Cf. Duhon v. Nelson,* 126 P.3d 262, 268 (Colo. App. 2005) ("Bare statements made in the litigants' briefs cannot supply that which must appear from a certified record.").

¶ 26    Because the record contains no reason to believe defendant was dissatisfied with counsel, the court was neither required to make any inquiry nor provide substitute counsel for defendant.

## *IV.    Co-Conspirator Statements*

¶ 27    Lastly, defendant contends that the trial court erred in admitting evidence of four telephone calls made by the driver to either him or the girlfriend. We conclude that reversal is not warranted.

¶ 28    Prior to trial, the prosecution filed a "Motion in Limine Regarding the Admissibility of Co-Defendant Statements," arguing that the statements made during the calls were admissible under

CRE 801(d)(2)(E) because they "were made by co-conspirators during the course and in furtherance of the conspiracy."

¶ 29 Defense counsel objected to the introduction of or reference to any of the four calls (three with the girlfriend and one with defendant), arguing that she was "not sure" that the prosecution could, as required, prove (1) the existence of a conspiracy independent of the calls and (2) the calls were made during and in furtherance of the conspiracy.

¶ 30 The prosecution countered, arguing there was evidence of a conspiracy independent of the calls: (1) the girlfriend would testify that defendant was staying at her house and that she and defendant were working together to accumulate enough money to "bond out" the driver by selling the stolen scooter; and (2) the prosecution would present "testimony and evidence that [defendant] did, in fact, go to [the girlfriend's] storage unit to get the bike in an effort to sell it, which is still an ongoing commission of the motor vehicle theft."

¶ 31 The trial court found that there was evidence other than the calls themselves that suggested a conspiracy between the three

individuals,[3] and that "disposing of [an] item to turn that item into money" is "part of stealing something" and therefore furthers the conspiracy. Thus, the trial court ruled the calls were admissible "as non-hearsay statements of co-conspirators, in furtherance of the conspiracy," under CRE 801(d)(2)(E).

¶ 32    On appeal, defendant contends that the trial court erred in admitting the evidence under the co-conspirator statement rule.[4] We agree, in part.

¶ 33    We review a trial court's evidentiary rulings for an abuse of discretion, *People v. Douglas*, 2012 COA 57, ¶ 41, which "will only be found upon a showing that the court misconstrued or misapplied

---

[3] The court noted there was evidence that (1) the three individuals "were working in concert with one another"; (2) they were all living together; and (3) defendant was seen with several other people, on different occasions, at the storage facility.

[4] Defendant also contends that the evidence was inadmissible because it was irrelevant. *See* CRE 401, 402. Defendant did not, however, object on this ground in the trial court. Consequently, reversal is not warranted on this ground absent a finding of plain error. *See People v. Ujaama*, 2012 COA 36, ¶¶ 37-38. No plain error is evident to us. *See People v. Osorio-Bahena*, 2013 COA 55, ¶ 69 (Plain error is error that is obvious, substantial, and "so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.").

the law or otherwise reached a manifestly arbitrary, unreasonable, or unfair result." *People v. Pollard*, 2013 COA 31M, ¶ 10.

¶ 34     CRE 801(d)(2)(E) allows "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" to be admitted.[5]

> The proponent of the statement bears the burden to establish by a preponderance of the evidence that the party against whom the statement is offered and the declarant were members of a conspiracy and that the declarant's statement was made during the course of and in furtherance of the conspiracy.

*People v. Rivera*, 56 P.3d 1155, 1166 (Colo. App. 2002). "The contents of the statement may be considered to establish the existence of a conspiracy and participation by the party against whom the statement is offered. However, there must be corroborating evidence apart from the contents of the statement itself." *Id.*; *see* CRE 801(d)(2).

---

[5] In *Van Riper v. United States*, 13 F.2d 961 (2d Cir. 1926), Judge Learned Hand described the reason for admitting such statements: "When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all." *Id.* at 967.

¶ 35    Here, the prosecution asserted that there was a conspiracy, of which defendant and the driver were a part, to steal and sell the scooter.  The calls supported that assertion: in the first call, the driver tells the girlfriend that defendant "ordered that f***ing thing" and "said [he] could sell that"; in the second, defendant tells the driver that he still wants to sell the scooter and can make money doing so; and, in the third and fourth conversations, the driver and the girlfriend discuss defendant's removal of the scooter from the storage unit, with the driver saying defendant "made money on that scooter."

¶ 36    Further, there was corroborative evidence, apart from the calls themselves, of such a conspiracy:

- The girlfriend testified that the driver had admitted that he stole the scooter.

- The day after the scooter was stolen, the driver sent a text message to defendant saying, "[y]a, its [sic] a Honda PCX 150."

- The girlfriend testified that, at the driver's behest, she had rented the storage unit at which the scooter's license plate was later found and, although the unit was rented

in her name, only the driver and defendant had keys to the unit (and were with the girlfriend when she rented it).

- Photographs captured from video surveillance footage showed "three parties, what looks like moving a scooter, a motorcycle, [from the storage unit] into the back of a pickup."

- The girlfriend testified that defendant told her that he had damaged the storage unit's lock in the process of removing the scooter therefrom.

- The storage facility's manager identified defendant as the person who reported having broken the lock on the storage unit.

¶ 37    When combined with the proffered statements, the evidence was sufficient to support a finding that a conspiracy existed involving the driver and defendant.

¶ 38    Defendant asserts, however, that the calls were not made during the pendency of the conspiracy because, in his view, the conspiracy ended upon the theft of the scooter.

¶ 39    To be sure, "co-conspirator statements made after the conspirators attain the object of the conspiracy are not admissible

under [the co-conspirator] exception unless the proponent demonstrates 'an express original agreement among the conspirators to continue to act in concert.'" *Blecha v. People*, 962 P.2d 931, 938 (Colo. 1998) (quoting *Grunewald v. United States*, 353 U.S. 391, 404 (1957)). The proponent of the evidence "can satisfy this requirement by showing that the objectives of the original conspiracy include such an agreement or that there exists a separate conspiracy to conceal." *Id.*

¶ 40 We discern no evidence tending to show that the objectives of the original conspiracy — or of a separate conspiracy — included concealment of evidence of the theft. That, however, does not end the inquiry because the "object of a conspiracy" is not necessarily confined to the commission of a particular crime. Rather, sometimes it includes events closely related to the commission of that crime. *See, e.g.*, 2 *McCormick on Evidence* § 259, at 291 n.52 (Kenneth S. Broun ed., 7th ed. 2013) ("[T]he aims of the conspiracy may extend beyond the commission of the crime to include additional related acts, such as a perpetrator receiving payment for his part, or securing proceeds from [a] murder victim's trust.") (citations omitted); *id.* at 291 ("Under some circumstances, the

18

duration of the conspiracy is held to extend beyond the commission of the principal crime to include closely connected disposition of its fruits . . . ."); 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:60, at 506-07 (4th ed. 2013) (noting, e.g., that "the crime of arson, if committed for the purpose of collecting insurance, continues after the property in question has been destroyed, at least until the object of collecting payment has been realized, and for similar reasons conspiracy to commit robbery does not end until the thieves divide the loot"); *see also State v. Yslas*, 676 P.2d 1118, 1122 (Ariz. 1984) (indicating that a conspiracy is still operative "where conspirators make specific pre-planned efforts of escape, payment, concealment, or conversion of the fruits of the crime") (emphasis omitted).[6]

---

[6] Because CRE 801(d)(2)(E) is identical to a provision found in the federal rules of evidence and in the rules of evidence of many states, we consider cases from, and authorities concerning, those jurisdictions persuasive. *See, e.g., Faris v. Rothenberg*, 648 P.2d 1089, 1091 n.1 (Colo. 1982) ("Fed.R.Civ.P. 63 is identical to C.R.C.P. 63. Thus, federal cases and authorities interpreting the federal rule are highly persuasive."); *cf. Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 364 (Colo. 2003) ("The interpretation of other states is especially persuasive" in part because "the language of the Colorado statute . . . is nearly identical to the language of dissenters' rights statutes around the country.").

¶ 41    Here, the record supports the conclusion that the aim of the conspiracy was not just to steal the scooter, but to sell (and obtain the proceeds from the sale of) it as well.  Thus, the conspiracy would not terminate until the scooter was sold and the proceeds of the sale were distributed.  *See, e.g., United States v. Kahan*, 572 F.2d 923, 935 (2d Cir. 1978) ("It is too easy to argue that the conspiracy was at an end when the object of the conspiracy as charged was realized in appellants' receipt and possession of the stolen property . . . .  But the Court was not free to rule as a matter of law that the conspiracy did not include payment by appellants as a term or to rule that the conspiracy ended with the seizure and arrests.") (citation omitted); *Williams v. United States*, 655 A.2d 310, 314 (D.C. 1995) ("Many courts have recognized that the division of the spoils is a continuing part of the crime, including conspiracy.").

¶ 42    Because the calls indicate the scooter had not been sold by the time of at least the first two conversations, and that the proceeds had not been distributed between defendant and the driver by the time of any of the four conversations, the statements in each of the four calls were made during the pendency of the conspiracy.

20

¶ 43     The remaining question is whether the statements were made "in furtherance" of the conspiracy.

¶ 44     "The [in furtherance] limitation is usually expressed in terms of an exclusion of statements that were casual conversation, idle gossip, or mere narratives of past events."  *Williams*, 655 A.2d at 313; *see* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.34[5], at 801-117 (Joseph M. McLaughlin ed., 2d ed. 2015) ("In general, this requirement bars 'mere narratives of past successes or failures' and a 'conspirator's casual comments.'"); *see also, e.g., Fratta v. Quarterman*, 536 F.3d 485, 504 (5th Cir. 2008) (reporting the conspiracy's status without "advanc[ing] the cause of or facilitat[ing] the conspiracy" did not constitute statements in furtherance of the conspiracy); *United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003) (finding casual conversation about how much marijuana was bagged was simply "idle chatter" that did not further the conspiracy (quoting *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000))); *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) (finding "casual storytelling in a bar, more than two years after the event," was "idle chatter" that was not in furtherance of the conspiracy); *United*

*States v. Fielding*, 645 F.2d 719, 726-27 (9th Cir. 1981) (finding mere narrative declarations that do not further the objectives of the conspiracy, such as those that induce others to join, are not in furtherance of the conspiracy).

¶ 45    The furtherance requirement is satisfied, however, by "any statement that 'can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator['s] or other person's usefulness to the conspiracy.'" 5 Weinstein & Berger, § 801.34[5], at 801-117 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988)); *see United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010) (noting that a statement susceptible of alternative interpretations need not have been made exclusively or even primarily to further the conspiracy as long as a reasonable basis exists for concluding it furthered the conspiracy). "Statements generally satisfy the furtherance requirement if the speaker is trying to get transactions started on behalf of the conspiracy . . . ." 4 Mueller & Kirkpatrick, § 8:61, at 514.[7]

_____

[7] The furtherance requirement can also be satisfied by statements that describe past occurrences to other members in order to map

¶ 46    With these principles in mind, we consider the four calls, the pertinent parts of which are attached as Appendix 1 to this opinion.

¶ 47    The first call was between the driver and the girlfriend, while the second call was between the driver and defendant. In those calls, first the driver, then defendant, proposed a course of action, consistent with what the driver indicated was the original object of the conspiracy — i.e., selling the stolen scooter (regardless of whether the money would be used to post bail for the driver). Because the conspirators were not, in either instance, involved in idle chatter or merely a narrative of past events, but rather, were proposing measures to advance the aims of the conspiracy, the statements in those two calls were properly admitted under CRE 801(d)(2)(E).[8]

---

out future strategy and by statements that keep other members of the venture current on the progress and problems that are being encountered, and certainly statements relating to payment or compensation or reward for participating and contributing to the criminal enterprise can further the venture.

4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:61, at 515-16 (4th ed. 2013) (footnotes omitted).

[8] The statements in the second call — the one involving the driver and defendant — were admissible on other grounds as well. *See People v. Chase*, 2013 COA 27, ¶ 17 (noting an appellate court "may

23

¶ 48     The same cannot, however, be said with respect to the statements recorded in the latter two calls.  Both of those calls were between the driver and the girlfriend.

¶ 49     In the third call, the driver does not propose anything be done with the scooter or its proceeds.  He instead postulates that the scooter had been sold, adding, "[Defendant] didn't go down there to get rid of [the scooter] for you or for me.  He made money on it. . . . [T]he bottom line is [defendant] is getting over on us."  A statement indicating that one conspirator believed he had been betrayed by the other can hardly be characterized as having a purpose of furthering or advancing the aims of the conspiracy.

¶ 50     The fourth call does not satisfy this requirement either.  In that call, the driver seems surprised, and then displeased, to find out that defendant is now renting the storage unit and has moved all of the driver's possessions out of it.  The driver's disparaging

---

affirm a [district] court's ruling on grounds different from those employed by that court, as long as they are supported by the record").  Defendant's statements during the call constituted admissions by a party-opponent.  *See* CRE 801(d)(2); *People v. Gable,* 647 P.2d 246, 255 (Colo. App. 1982).  And, the driver's statements were admissible nonhearsay because they placed defendant's statements in context, making the call understandable to the jury.  *See People v. Glover,* 2015 COA 16, ¶ 42.

24

remark about defendant —"[Defendant] probably kept some stuff that he wanted. Like the scooter, for instance. You know? I guarantee you he made money on that scooter." — is more akin to idle chatter or speculation than direction, encouragement, or a proposed course of action for advancing the aims of the conspiracy. Thus, it too would not satisfy the furtherance requirement of CRE 801(d)(2)(E).

¶ 51    Because the statements in the third and fourth calls did not satisfy the "in furtherance" requirement of CRE 801(d)(2)(E), the trial court abused its discretion in admitting them at trial.

¶ 52    Under Crim. P. 52(a), we are to disregard a harmless error. "Because the trial court's error is not one of constitutional dimension, defendant bears the burden of showing prejudice from the error." *People v. Casias*, 2012 COA 117, ¶ 60 (citation omitted). To obtain reversal, defendant must establish a reasonable probability that the inadmissible detail contributed to his conviction. *See id.* at ¶ 62.

¶ 53    A "reasonable probability" does not mean that it is "more likely than not" that the error caused the defendant's conviction; rather, it

25

means only a probability sufficient to undermine confidence in the outcome of the case.  *Id.* at ¶ 63.

¶ 54   In assessing the harmlessness of error in admitting evidence, we consider a number of factors, including the importance of the evidence to the prosecution's case, *see People v. Bass*, 155 P.3d 547, 551 (Colo. App. 2006); whether the proffered evidence was cumulative; the presence of other evidence corroborating or contradicting the point for which the evidence was offered; and the overall strength of the state's case, *Casias*, ¶ 64.  "'[T]he single most important factor' in a nonconstitutional harmless error inquiry is whether the case was 'close.'"  *Id.* at ¶ 69 (quoting *United States v. Ince*, 21 F.3d 576, 584 (4th Cir. 1994)).

¶ 55   Here, we cannot say that the statements in the erroneously admitted third and fourth calls were wholly unimportant to the prosecution.  However, unlike the first two calls, the prosecution never referenced the third or fourth call in its opening statement or opening and rebuttal closing arguments.  The prosecution, then, did not place any emphasis on the statements in the third and fourth calls.

¶ 56    The statements contained in the third and fourth calls were not technically cumulative of other evidence, nor were they corroborated or contradicted by other evidence in the case.  They were, though, of relatively minor consequence compared to those in the admissible first two calls.

¶ 57    Finally, this was not, in our view, a close case.  In addition to the admissible evidence of the first two calls, the prosecution presented (1) a text message from the driver to defendant in which the driver identified the type of scooter that had been stolen; (2) testimony from the girlfriend identifying defendant as being with her (and receiving a key) when she rented the storage unit in which the scooter's license plates were later found; (3) security footage of three men removing what appeared to be a "scooter" or "motorcycle" from the storage unit; and (4) testimony, from the girlfriend and the storage unit manager, that defendant admitted, the day after the three men were surveilled removing the "scooter" or "motorcycle" from the unit, that he had broken the lock to get into the storage unit the previous day.  In response, the defense presented no evidence and argued only that the prosecution's case was based on speculation.

¶ 58     Because the inadmissible evidence was not an important part of the prosecution's case, because the inadmissible evidence paled in significance to the properly admitted phone call evidence, and because this was not a "close" case, we perceive no reasonable probability that the court's evidentiary error influenced the jury's verdict in any manner.  Consequently, the erroneously admitted evidence was harmless, and reversal is not warranted.

*V.     Conclusion*

¶ 59     The judgment of conviction is affirmed.

¶ 60     JUDGE TAUBMAN and JUDGE FREYRE concur.

The first call (between the driver and the girlfriend):

Driver: Was [defendant] not helping you come up with this money [for bail] or what?

Girlfriend: [Defendant] is trying, babe. With what we have for . . . pawning, there's nothing. . . . He was like, it would be different if he would have put some of the good stuff in your, um, shed. But nothing of value is in yours. I'm like, I know.

Driver: Well, that scooter.

Girlfriend: Nobody wants to touch that thing with a 10-foot pole.

Driver: Why? The f***ed up thing is [defendant] and [another individual] ordered that f***ing thing. They said they could sell that.

Girlfriend: There's [sic] too many cc's.

Driver: It doesn't matter how many cc's, babe. Nobody can get it legal no matter if it's 59 cc's or 49 cc's or higher. It doesn't matter how many cc's it is, nobody can get it legal anyway. Well, go pick up another one then. And sell that to them, ya know?

The second call (between the driver and defendant):

Defendant: We got raided this morning. You know that don't you?

Driver: I heard something about that, yeah.

Defendant: . . . All the good shit I brought over to [the girlfriend]. . . . She wants to just move the bike out 'cause she's scared and I keep telling her hang on I'll sell it. . . . I'll get something for it. I'm trying to, I'm trying to.

Driver: Yeah, even if it's fifty bucks.

Defendant: That's what I'm saying. So don't let her just throw it away, 'cause I'll find somebody . . . .

Driver: Well if it's still in there by the time I get out, I'm gonna go take it back to where it belongs (laughing).

The third call (between the driver and the girlfriend):

Driver: Guess what happened with the scooter too. . . . [Defendant] didn't go down there to get rid of that for you or for me, he made money on it. He made money on that.

Girlfriend: . . . I tried to call down there today because there were two locks on there . . . .

Driver: . . . Maybe [defendant] put two on there.

Girlfriend: I don't know.

Driver: You think [defendant] got rid of that scooter for no reason? F*** no, he made money on it.
. . .
Girlfriend: I know this much, I'm glad it's gone.

30

Driver: I know, I'm glad it's gone too. Don't get me wrong, I woulda paid to f***in' get rid of that thing. You know? But still, the bottom line is [defendant] is getting over on us. Ok? Um, also, there's license plates, too, that somebody needs to get rid of.

Girlfriend: Where?

Driver: Um, same room as the other deal. . . . It's hidden kinda good. It's not like out in the open. It's up and, ya know, tucked away somewhere. . . . I think there's two of them. . . . I found those walking down the street.

The fourth call (between the driver and the girlfriend):

Driver: You can try to send [defendant] over there and clean it.

. . . .

Girlfriend: [Defendant] is renting it.

. . . .

Driver: How would you not tell me that?

. . . .

Girlfriend: Your stuff's not in there.

Driver: Well it was in there and . . . as far as we know [defendant] moved it all out. He probably kept some stuff that he wanted. Like the scooter, for instance. You know? I guarantee you he made money on that scooter.

31

Girlfriend: I'm sure he did.