22CA1968 Peo v Gist 08-29-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1968 Larimer County District Court No. 21CR460 Honorable Laurie K. Dean, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Dennis J. Gist, Defendant-Appellant. JUDGMENT AFFIRMED Division II Opinion by JUDGE GROVE Fox and Sullivan, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 29, 2024 Philip J. Weiser, Attorney General, Claire V. Collins, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for Defendant-Appellant
1 ¶ 1 Defendant, Dennis J. Gist, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree murder after deliberation, first degree felony murder, second degree burglary, and two counts of tampering with physical evidence. We affirm. I. Background ¶ 2 The prosecution presented the following evidence at trial. ¶ 3 On the morning of the murder, the victim, Jordan Sinden, and two friends, Aimee Lansden and Mason Bridgeman, slept in Sinden’s motel room. Sinden had surveillance cameras installed inside and outside the motel room. ¶ 4 Gist and one of his codefendants, Jonathan Fuhrman, drove to the motel. Fuhrman knocked on Sinden’s door while Gist stood to the side. After several minutes, Bridgeman opened the door. Fuhrman stepped inside. Gist, who was wearing a distinctive black leather jacket, a black baseball hat, and a black glove on his left hand, followed Fuhrman into the room, and Bridgeman exited. Gist pulled the blanket off Sinden and shot him in the eye with a .22 caliber revolver, killing him. Fuhrman then retrieved a cell phone 
2 that was next to Sinden, which Sinden had been using to watch the surveillance camera footage. ¶ 5 Fuhrman, Lansden, and Gist got into Fuhrman’s car. Gist told Fuhrman to drive to the house of codefendant Derrick Pippin so that he could dispose of the revolver. Before the shooting, Pippin had given Gist the revolver in exchange for a 9-millimeter Ruger handgun and magazine. ¶ 6 Once at Pippin’s house, Gist got out of the car and went inside where he gave Pippin the revolver, leather jacket, baseball hat, and cell phone. Gist returned to the car with only the cell phone, which had been factory reset. Pippin placed the jacket and hat in a bag and stored it in a back room of his house. He disassembled the revolver, wiped it down, wrapped it up, and gave it to a friend. He also hid the Ruger handgun behind his house and the magazine in a tree. ¶ 7 Gist was arrested the next day. Fuhrman and Pippin later helped law enforcement recover the revolver, black leather jacket, black hat, Ruger handgun, and magazine. ¶ 8 The prosecution charged Gist with first degree murder after deliberation, first degree felony murder, second degree burglary, two 
3 counts of tampering with physical evidence, and two counts of possession of a weapon by a previous offender (POWPO). ¶ 9 Law enforcement officers collected DNA samples from Sinden, Gist, Fuhrman, and Pippin. The black leather jacket, Ruger magazine, Ruger handgun, and revolver were submitted to the Colorado Bureau of Investigation (CBI) for DNA analysis. Each item produced a DNA mixture indicative of four contributors. The analysis of the jacket indicated very strong support that Gist and Pippen were contributors to the DNA mixture. The analysis of the magazine indicated very strong support that Sinden and Pippen were contributors but only moderate support that Gist was a contributor. And Gist was excluded as a contributor to the DNA mixtures obtained from the handgun and the revolver. ¶ 10 Before trial, Gist filed a motion to exclude DNA evidence with four or more contributors and requested a hearing under People v. Shreck, 22 P.3d 68 (Colo. 2001). The trial court conducted a Shreck hearing. The prosecution presented testimony from the DNA program manager and technical leader from the CBI, as well as the CBI analyst who conducted the DNA analysis. The program manager testified about CBI’s process for DNA analysis; the CBI’s 
4 validation and ongoing audits of STRmix, the probabilistic genotyping software program used for DNA analysis; and the process for determining the number of contributors to a DNA mixture. The DNA analyst further explained the process for determining the number of contributors to a DNA mixture, as well as her analysis of the items in this case. ¶ 11 The defense presented testimony from a law professor who was qualified as an expert in forensic DNA typing. The professor testified about complex DNA mixtures and the fact that the true number of contributors can never be known, otherwise known as the “ground truth.” The professor also testified regarding an article that discussed whether confirmation bias might influence DNA mixture interpretation. He further testified that he disagreed with the DNA analyst’s conclusion that the leather jacket had four contributors because, he opined, that decision was subjective. ¶ 12 Based on this testimony, defense counsel argued that the DNA mixtures with four contributors were unreliable because the conclusions that the DNA analysts drew were subjective and vulnerable to confirmation bias. In response, the prosecutor argued that courts throughout Colorado had repeatedly approved the 
5 admission of four-contributor DNA following Shreck hearings, and that the complexities inherent in assigning a number of contributors is not an issue unique to the technology used by the CBI. ¶ 13 The trial court issued a detailed order denying Gist’s motion to exclude the DNA evidence. The court found the prosecution’s witnesses to be credible and that the evidence was reasonably reliable, relevant, and satisfied CRE 403. The court found that the DNA evidence with four contributors was reasonably reliable because STRmix has been validated by the CBI for up to five person mixtures, the CBI has developed operating standards to ensure the reliability of the results, STRmix results have been subjected to peer review and publication, STRmix is not a new or novel technology, STRmix has been generally accepted in the scientific community, and STRmix results for four or more contributors had been found to be reliable by other courts in Colorado. The court further found that the DNA analyst was qualified, her testimony would be helpful to the jury, and the probative value of the DNA evidence outweighed any danger of misleading the jury or unfairly prejudicing Gist. 
6 ¶ 14 At trial, the DNA analyst testified as to her findings regarding the evidence submitted for DNA testing, including the four-contributor DNA mixtures. The prosecution presented testimony from twenty-seven other witnesses, three of whom — Lansden, Bridgeman, and Fuhrman — were present during the shooting. The jury viewed a video of the shooting, a video of Gist and Fuhrman outside Sinden’s motel room before the shooting, and videos of Gist in Sinden’s room one day and two days before the shooting. ¶ 15 The defense’s theory as articulated in the jury instructions was that Gist “was not the individual who caused the death of Jordan Sinden.” ¶ 16 The jury found Gist guilty on all of the charges presented to it. The prosecution subsequently requested dismissal of the POWPO charges, and the trial court dismissed them. The court sentenced Gist to a controlling sentence of life in prison without the possibility of parole. II. Discussion ¶ 17 Gist contends that the trial court erroneously admitted expert witness testimony regarding DNA evidence with four contributors, 
7 which violated the standards for expert testimony outlined in Shreck as well as his constitutional right to a fair trial. He argues that four-contributor DNA mixtures are inherently unreliable because the true number of contributors can never be known, and the analyst’s determination of this number is subjective and subject to confirmation bias. He further argues that the probative value of the DNA evidence with four contributors was substantially outweighed by the dangers of misleading the jury and unfair prejudice because jurors place great emphasis on DNA evidence. We need not determine if the admission of this testimony was error, however, because even if the court’s ruling was erroneous, its error was harmless. A. Standards of Review and Reversal ¶ 18 If an evidentiary error is preserved by objection, the error is reviewed under either the harmless error or constitutional harmless error standard. Hagos v. People, 2012 CO 63, ¶¶ 11-12. Whether we apply a constitutional harmless error standard rather than harmless error depends on if “the trial court’s evidentiary ruling, in and of itself, deprived the defendant of any meaningful opportunity to present a complete defense.” Krutsinger v. People, 219 P.3d 
8 1054, 1061 (Colo. 2009). “It does not follow, of course, that every restriction on a defendant’s attempts to challenge the credibility of evidence against him, or even every erroneous evidentiary ruling having that effect, amounts to federal constitutional error.” Id. at 1062. “[T]he standard or test for assessing whether a defendant’s right to . . . present a defense has been violated by evidentiary rulings is clearly dependent upon the extent to which he was permitted to subject the prosecutor’s case to ‘meaningful adversarial testing.’” Id. (quoting Crane v. Kentucky, 476 U.S. 683, 691 (1986)). In essence, we do not review for constitutional harmless error unless “the trial court’s [evidentiary] ruling . . . effectively barred the defendant from meaningfully testing evidence central to establishing his guilt.” Id. ¶ 19 Here, defense counsel extensively cross-examined twenty-five of the twenty-eight witnesses, including the DNA analyst on her determination that some of the DNA evidence had four contributors. Under such circumstances, we are not persuaded that the trial court’s ruling regarding the DNA analyst’s testimony denied Gist the opportunity to subject the prosecution’s case to meaningful adversarial testing. Accordingly, we will review the trial court’s 
9 ruling for nonconstitutional harmless error and disregard any error unless it “substantially influenced the verdict or affected the fairness of the trial proceedings.” Hagos, ¶ 12 (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)). B. Applicable Law ¶ 20 The admission of DNA expert testimony is governed by CRE 702 and CRE 403. Shreck, 22 P.3d at 77. Under CRE 702, such evidence is admissible when (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; and (3) the expert testimony is useful to the jury. Id. Under CRE 403, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. C. Harmless Error ¶ 21 As mentioned, we need not decide whether admitting the DNA analyst’s testimony regarding four-contributor DNA mixtures was error because any error was harmless. We reach this conclusion for several reasons. ¶ 22 First, the DNA mixtures collected from the murder weapon and the Ruger handgun were not inculpatory because Gist was 
10 excluded as a contributor to both samples. Moreover, Gist’s fingerprints were not on either weapon. Indeed, in opening statement and closing argument, defense counsel argued that Gist’s DNA and fingerprints were not on the murder weapon or the Ruger, which, defense counsel maintained, provided reasonable doubt that he was the shooter. ¶ 23 Second, the DNA evidence was cumulative of other evidence connecting Gist to the leather jacket and the Ruger magazine. See People v. Faussett, 2016 COA 94M, ¶ 54 (“In assessing the harmlessness of error in admitting evidence, we consider a number of factors, including . . . whether the proffered evidence was cumulative . . . .”). The following evidence was introduced regarding the jacket: • In the surveillance video from two days before the shooting, Gist was seen wearing a leather jacket with distinctive threading on the upper back and shoulders. • Bridgeman identified Gist in the surveillance video of the shooting and testified that Gist was wearing the same black leather jacket that he was wearing as shown in the surveillance video taken two days before the shooting. 
11 • The lead investigator testified that the leather jacket Gist wore two days before the shooting looked similar to the jacket law enforcement collected from Pippin’s house. He further testified that the shooter in the surveillance video wore a similar leather jacket. And he discussed the distinctive threading on the jacket’s upper back and shoulders that the jury could compare to the jacket admitted into evidence, the jacket Gist wore two days before the shooting, and the jacket the shooter wore. • Fuhrman identified the leather jacket admitted into evidence as the same one that Gist was wearing when he shot Sinden. • Pippin testified that Gist gave him the black leather jacket after the shooting and that it matched the jacket admitted into evidence. ¶ 24 Regarding the magazine, Pippin testified that he had exchanged with Gist the revolver for the Ruger handgun and had later hidden the Ruger magazine in a tree. Pippin later assisted law enforcement in collecting the magazine, which was admitted into evidence. 
12 ¶ 25 Third, there was overwhelming evidence of Gist’s guilt independent of the DNA evidence. See Pernell v. People, 2018 CO 13, ¶¶ 25-26 (concluding that, because the properly admitted evidence overwhelmingly showed the defendant’s guilt, the evidentiary error was harmless). • Surveillance video showed Gist and Fuhrman waiting outside Sinden’s motel room before the shooting, and Gist admitted in a police interview to being in the room when Sinden was shot. • There was surveillance video of the shooting, and Lansden and Fuhrman both identified Gist as the shooter. • Bridgeman testified that, although he was not in the room during the shooting, he saw Gist enter the room and identified Gist in the surveillance video of the shooting. • Gunshot residue was found on Gist’s hands, confirming he had close contact with a fired weapon. • Pippin told law enforcement that Gist told him, “I killed Jordan.” 
13 • Sinden’s best friend testified that Gist told him on the day of the shooting, “[m]ission accomplished,” “[t]hat’s a done deal,” “[he] gone,” and “[h]e’s asleep” after returning from Sinden’s motel room. • Pippin testified that Gist gave him the revolver, a black leather jacket, and a hat, which were recovered by law enforcement and matched those items admitted into evidence. • The lead investigator testified that the revolver recovered by law enforcement appeared to be the same revolver that was used in the shooting. • A firearms expert testified that a bullet fragment recovered from Sinden’s skull during the autopsy was conclusively fired from the revolver. • As previously explained, the leather jacket worn by the shooter and admitted into evidence appeared to be the same jacket Gist wore in the surveillance video from two days before the shooting. 
14 • Fuhrman testified that Gist was wearing the leather jacket and hat, which were recovered by law enforcement and admitted into evidence, when he shot Sinden. • When Gist was arrested, he was wearing shoes similar to those worn by the shooter in the surveillance video. He also had on his person a pair of gloves that tested positive for gunshot residue. ¶ 26 Given the strength of the prosecution’s case, we cannot conclude that the admission of DNA evidence with four contributors, even if improper, substantially influenced the verdict or affected the fairness of the trial proceedings. See People v. Casias, 2012 COA 117, ¶ 69 (“‘[T]he single most important factor’ in a nonconstitutional harmless error inquiry is whether the case was ‘close.’” (quoting United States. v. Ince, 21 F.3d 576, 584 (4th Cir. 1994)). III. Disposition ¶ 27 The judgment of conviction is affirmed. JUDGE FOX and JUDGE SULLIVAN concur.