23CA0604 Peo v King 11-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0604
El Paso County District Court No. 21CR5521
Honorable Laura N. Findorff, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Shirley Briar Rose King,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

---

Philip J. Weiser, Attorney General, Jessica R. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kelly A. Corcoran, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Shirley Briar Rose King, appeals her convictions of pimping, keeping a place of prostitution, prostitution, and pandering. We affirm.

## I. Background

¶ 2    In 2021, after receiving tips from the community, the Colorado Springs Police Department started investigating King and her massage parlor, Sutra Healing Center, for suspected prostitution and pimping.

¶ 3    After discovering an online advertisement for Sutra Healing Center on a commercial sex related website that referenced "sexual things," the Human Trafficking Division planned an undercover operation.

¶ 4    Detective Tremaine White, an undercover police officer, contacted King[1] using an alias. After texting back and forth about scheduling an appointment, White met with King at Sutra Healing Center. While King gave White a tour, White inquired about King providing women for an "adult entertainment" party. When White asked King if she could dance nude at the party, she responded

---

[1] The phone number listed on the online advertisement matched the phone number King later provided to police.

that, while she performs all her other services nude, she does not dance nude. However, King said she could provide other women who would dance nude. After briefly discussing other details, White paid King a one-hundred-dollar deposit for the party. King asked White to place the money on the donation table.[2]

¶ 5     A few weeks later, White returned to Sutra Healing Center for a tantra session with King. King explained that she received a percentage of the payments made to her employees. King said that she was aware her employees were having sex at Sutra Healing Center because she would find condoms.

¶ 6     During White's tantra session, King performed a body slide[3] while they discussed details about the upcoming party. King said that she and the other women would have sex in exchange for money. White and King talked about the specific sexual acts that would be performed and their estimated prices. They scheduled the

_____

[2] Detective Tyler Weems, who was qualified as an expert in commercial sex trafficking and pimping investigation, later testified that a "donation" is synonymous with payment being received for an illegal sex related service.

[3] King laid on top of White, completely nude, and rubbed her body back and forth on his.

party for September 22, 2021. White paid King four hundred dollars for the tantra session.

¶ 7 Over the next few days, King sent White photographs of the women she recruited to participate in the party, and they finalized the remaining details. King agreed to provide five to seven women for White's four to six friends.

¶ 8 On the night of September 22, 2021, King arrived at the house and called all the women to an upstairs room. There, White paid King in cash and King distributed the cash to each of the women.

¶ 9 Later that night, White told the women that his friends were there to pay for sexual acts that had been previously agreed upon. White asked each of the women whether they were willing to have sex in exchange for money and the amount they were asking for. Except for one woman, the women confirmed they were willing to exchange sex for money. Police officers then raided the party.

¶ 10 Along with evidence from the party, the jury also heard testimony from other individuals, including King's ex-boyfriend Richard Heizer. Heizer testified that King told him about the body slides and having clients turn over during massages.

¶ 11     Chelsie Chambers, a former employee of King, also testified. Chambers started working for King in October 2020. Chambers testified that she would collect payments from her clients and then place the cash payments in a safe that she accessed through a slot at the top. King then paid Chambers through a cash app. Chambers received less money from King than she was paid by her clients. While Chambers denied providing sexual acts, Jerry Allin testified that when he was Chambers' client at Sutra Healing Center, he paid Chambers for several sexual acts, including intercourse. Allin also testified that he received the VIP treatment at Sutra Healing Center, which included sexual acts in exchange for money.

¶ 12     King did not testify, but her interview with Detective Tyler Weems, the lead investigator, was introduced through his testimony. During this interview, King gave Weems her phone number and email. King agreed that her tantra services could be mistaken for prostitution and acknowledged that people might think she was pimping.

¶ 13     King was charged with pimping, keeping a place of prostitution, prostitution, and pandering. A jury convicted King as

charged. The trial court sentenced her to four years of supervised probation.

¶ 14 On appeal, King contends that (1) her pimping conviction was barred by the statute of limitations; (2) insufficient evidence supported her pimping conviction; and (3) a prejudicial variance in the prostitution and pandering charges requires reversal. King also contends that the trial court reversibly erred by (4) allowing the prosecution to introduce parts of an out-of-court interview over her rule-of-completeness objection; (5) admitting Facebook, cell phone extraction, and backpage.com data; and (6) admitting women's statements from a party who did not testify, under the co-conspirator hearsay exception. She also asserts cumulative error. We reject King's arguments and affirm the judgment.

## II. Statute of Limitations

¶ 15 King contends that the trial court lacked jurisdiction over her pimping charge because the earliest date in the complaint was outside the statute of limitations. We disagree and conclude, consistent with the holding in *People v. Grosko*, 2021 COA 28, that pimping is a continuing offense.

## A. Standard of Review and Applicable Law

¶ 16 "We review de novo issues concerning the application of a statute of limitations." *People v. Johnson*, 2013 COA 122, ¶ 7.

¶ 17 In Colorado, the statute of limitations operates as a jurisdictional bar to criminal prosecution. *People v. Butler*, 2017 COA 117, ¶ 16; *People v. Ware*, 39 P.3d 1277, 1279 (Colo. App. 2001). Accordingly, once the statute of limitations period has expired, there is no longer a risk of prosecution for that particular offense. *See Butler*, ¶ 16.

¶ 18 Statutes of limitation normally begin to run once a crime is completed. *Toussie v. United States*, 397 U.S. 112, 114 (1970). But in certain circumstances, "a crime continues beyond the first moment when all its substantive elements are satisfied." *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1192 (Colo. 2003). Such crimes are known as continuing offenses. *Id.* A continuing offense "continues (and the statute of limitations does not begin to run) so long as the illegal conduct continues." *Id.* at 1193; *see also* § 16-5-401(4), C.R.S. 2025 ("When an offense . . . is based on a series of acts performed at different times, the period of limitation prescribed by

this code . . . starts at the time when the last act in the series of acts is committed.").

¶ 19    We interpret statutes de novo. *People v. Smith*, 254 P.3d 1158, 1161 (Colo. 2011). Our goal is to give effect to the intent of the legislature. *Sigala v. Atencio's Mkt.*, 184 P.3d 40, 42 (Colo. 2008). We give words and phrases their plain and ordinary meaning. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011).

¶ 20    A person commits the offense of pimping when she "knowingly lives on or is supported or maintained in whole or in part by money or other thing of value earned, received, procured, or realized by any other person through prostitution." § 18-7-206, C.R.S. 2025. As a class 3 felony, pimping has a three-year statute of limitations. §§ 16-5-401(1)(a), 18-7-206.

¶ 21    In *Grosko*, a division of this court held that pimping is a continuing offense. *Grosko*, ¶ 21. The prosecution initially charged Grosko with attempted pimping of a victim in 2015. *Id.* at ¶ 14. In April 2016, the prosecution amended the information to include alleged pimping between January and December 2013. *Id.* at ¶ 15. After Grosko was convicted, he moved to dismiss the pimping charge because the prosecutor's amendment fell outside the

three-year statute of limitations. *Id.* The trial court found that the plain language of the pimping statute indicates that pimping is a continuing offense, and therefore, the statute of limitations did not run until December 2016, three years after the last act. *Id.* at ¶ 16. The division affirmed the trial court's decision and held that the plain and ordinary meaning of the phrase "lives on or is supported or maintained" defines a criminal act that takes place over time because the dictionary definitions of "living," "support," and "maintain" each "contemplate an ongoing period of time." *Id.* at ¶ 19.

¶ 22 The division relied on precedents from California courts interpreting a substantially similar pimping statute. In *People v. Lewis*, 143 Cal. Rptr. 587, 591 (Ct. App. 1978), the California appellate court held that the "[r]easonable interpretation of the statutory definition [of pimping] leads to but one conclusion that the legislative intent was that living or deriving support or maintenance from the earnings of a prostitute . . . is an ongoing continuing offense that occurs over a period of time." *See also People v. Culuko*, 92 Cal. Rptr. 2d 789, 801 (Ct. App. 2000) ("Typical

continuous course of conduct crimes include . . . pimping . . . ."); *People v. Dell*, 283 Cal. Rptr. 361, 372 (Ct. App. 1991).

### B.  Analysis

¶ 23     King urges us not to follow the *Grosko* holding for two reasons. She first argues that the *Grosko* division did not specify when the crime of pimping ends and, thus, when the statute of limitations period is triggered.  Second, she argues that the California authorities on which *Grosko* relies are distinguishable because they did not contemplate the statute of limitations.  We are unpersuaded.

¶ 24     The crime of pimping ends when the defendant is no longer living on or supported or maintained by proceeds from another's prostitution.  *See* § 18-7-206.  Therefore, the last charged instance in which the defendant is living on or supported or maintained by proceeds from another's prostitution triggers the statute of limitations.  *See Grosko*, ¶ 21.

¶ 25     Moreover, we reject King's argument that the California cases lack persuasive authority.  Determining whether an offense is continuing is a matter of statutory interpretation.  *Id.* at ¶ 11. Therefore, the California cases provide persuasive support because

they interpret "identical statutory language" that establishes pimping as a continuing offense. The cases did not need to consider the statute of limitations to provide support for the *Grosko* division's conclusion.

¶ 26 In this case, King was charged with pimping on October 5, 2021. King's last charged act of pimping others occurred on September 22, 2021. Therefore, it took place within the statute of limitations. Accordingly, we conclude that King's pimping conviction is not barred by the statute of limitations.

### III. Sufficiency

¶ 27 King next contends the prosecution presented insufficient evidence that she "knowingly live[d] on or [was] supported or maintained . . . by money . . . earned . . . by any other person through prostitution." § 18-7-206. We disagree.

#### A. Standard of Review and Applicable Law

¶ 28 "[W]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions." *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). We view the evidence as a whole and in the light most favorable to the prosecution to determine whether the evidence was

10

"sufficient to support the conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt." *People v. Griego*, 2018 CO 5, ¶ 24. In doing so, we give the prosecution "the benefit of every reasonable inference which might be fairly drawn from the evidence." *People v. Perez*, 2016 CO 12, ¶ 25 (quoting *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983)). It is the role of the jury to weigh the credibility of witnesses and to resolve conflicting testimony. *People v. Poe*, 2012 COA 166, ¶ 14. We may not substitute our judgment for that of the jury or reweigh conflicting evidence or the credibility of witnesses. *Id.*

¶ 29 To prove pimping, the prosecution had to prove that King "knowingly live[d] on or [was] supported or maintained in whole or in part by money or other thing of value earned, received, procured, or realized by any other person through prostitution." § 18-7-206. Specifically, "where the people's evidence establishes that a person knowingly applies a thing of value received through another's act of prostitution to his own benefit, whether it be a business or personal benefit, a prima facie case for proof of the crime of pimping has been made." *People v. Ganatta*, 638 P.2d 268, 271 (Colo. 1981).

11

## B. Analysis

¶ 30    Sufficient evidence supported King's pimping conviction.

¶ 31    The trial evidence showed the following:

- Allin testified that he had sex with Chambers for three hundred dollars at Sutra Healing Center.

- Chambers testified that her clients paid her in cash, which she deposited into a safe at Sutra Healing Center. King then paid Chambers through a cash app — an amount less than what Chambers received from her client. Only King had access to the safe.

- In a text message exchange between King and Chambers, King asked Chambers, "What did [Allin] get?" After telling King that Allin received a body slide and that she paid King two hundred dollars, King responded that she owed Chambers one hundred sixty dollars. King added, "He normally always gets a VIP when he gets a [body slide]."

- Allin testified that the VIP services he received at Sutra Healing Center included sexual acts, specifically a hand job from Chambers.

- Chambers testified that King used the money she received from her employees to cover Sutra Healing Center's administrative costs, rent, and advertising.

¶ 32     We conclude that this evidence is sufficient to support King's pimping conviction.

¶ 33     Nevertheless, King contends that the prosecution failed to establish beyond a reasonable doubt that King was supported or maintained by money obtained from prostitution.  However, in *Ganatta*, 638 P.2d at 271-72, our supreme court addressed "the question of what degree of proof is necessary to establish that one 'lives on' money from prostitution" and concluded that "[t]he scope of proof does not necessitate a showing that the money earned from prostitution was *actually* spent to provide support and maintenance if it may reasonably be *inferred* that the accused has spent the money or applied it to his benefit."  (Emphasis added.)  Here, the evidence, when viewed in the light most favorable to the prosecution, supports a reasonable inference that King used the funds to support her business.  *See People v. Vanderpauye*, 2021 COA 121, ¶ 49 (the determination of the credibility of witnesses is solely within the province of the jury), *aff'd*, 2023 CO 42.

¶ 34     Accordingly, we conclude that sufficient evidence supports King's pimping conviction.

## IV.   Variance

¶ 35     King next contends that reversal is required because the trial court allowed an impermissible variance when it extended the date range for the misdemeanor prostitution and pandering charges in the jury instructions.  While we agree that an error occurred, we conclude that reversal is not required.

### A.   Additional Facts

¶ 36     The prosecution charged King with committing prostitution and pandering "on or about September 22, 2021."  At trial, the court instructed the jury:

> The defendant is charged with committing the crimes of Pimping, Keeping a Place of Prostitution, Prostitution, and Pandering in El Paso County, Colorado, between and including January 1, 2016, and September 22, 2021.

¶ 37     In closing argument, the prosecutor stated:

> Ladies and gentlemen of the jury, I want to start here with the overall big picture.  The dates of alleged crime are charged between January 1, 2016, and the date of the party that occurred with Undercover Detective White on September 22, 2021.  You can consider anything that happened inside of that time

14

frame for either the crime that Ms. King is alleged – the crimes that Ms. King is alleged to have committed, and you can consider all of the evidence from that time period for any of those individual crimes. So that's the scope of the big picture that we're looking at.

. . . .

The elements of the crime of Prostitution. This one is simple . . . . In this case we know from [Allin's] testimony that he had sex with Shirley King and then paid her money for that. And that constitutes the crime of Prostitution.

Finally, we have the elements for the crime of Pandering . . . [a]nd in this case we have the specific incident of the party on September 22, which Shirley King arranged for knowing, based on the circumstantial evidence and your logic and common sense, that prostitution would be taking place at that party. And that constitutes the crime of Pandering.

B. Standard of Review and Applicable Law

¶ 38    A defendant has a constitutional right to notice of the charges against her. *Hoggard v. People*, 2020 CO 54, ¶ 22. In Colorado, that notice is generally provided through the filing of a complaint or information. *Id.* at ¶ 23. A complaint or information is sufficient when it advises the accused of the charges so that she has a "fair and adequate opportunity to prepare [her] defense" and is "not

15

taken by surprise" by the evidence offered at trial. *People v. Martinez*, 2024 COA 34, ¶ 21 (citation omitted).

¶ 39 A variance occurs when a charge contained in the charging document differs from the charge for which a defendant is convicted. *See People v. Gallegos*, 260 P.3d 15, 25 (Colo. App. 2010). There are two types of variances, but King alleges only one — a simple variance — occurred here. A simple variance occurs when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the charging document. *People v. Deutsch*, 2020 COA 114, ¶ 25. A simple variance requires reversal only if it prejudices the defendant's substantial rights. *People v. Rail*, 2016 COA 24, ¶ 51, *aff'd*, 2019 CO 99. Thus, we will not disturb the judgment for a simple variance "as long as the proof upon which the conviction is based corresponds to an offense that was clearly set out in the charging instrument." *Campbell v. People*, 2020 CO 49, ¶ 45.

¶ 40 We review de novo whether a variance occurred, *see People v. Carter*, 2021 COA 29, ¶ 35, but because King did not preserve this claim, the plain error standard of reversal applies. *See Hagos v. People*, 2012 CO 63, ¶ 14. That standard requires an error to be

16

obvious and substantial.  *Id.*  We reverse only when the error so undermined the fundamental fairness of the trial that it casts serious doubt on the reliability of the judgment of conviction.  *Id.*

### C.  Analysis

¶ 41     The parties dispute preservation.  The People contend King invited the error by tendering the following statement of the case:

> The defendant is charged with committing the crimes of Pimping, Keeping a Place of Prostitution, Prostitution, and Pandering, in El Paso County, Colorado, between and including January 1, 2016 and September 22, 2021.

¶ 42     We are not convinced.  The doctrine of invited error prevents a party from complaining on appeal about an error that she injected into the case.  *People v. Rediger*, 2018 CO 32, ¶ 34.  When a jury instruction error is due to inadvertence or attorney incompetence rather than trial strategy, an appellate court should review for plain error instead of treating the contention as waived under the invited error doctrine.  *See People v. Stewart*, 55 P.3d 107, 120 (Colo. 2002).  Here, we can discern no reasonably strategic reason for King's error and conclude it resulted from inadvertence or incompetence and not strategy.  Therefore, we address the merits of her contention.

¶ 43    A variance between the specific date of the offense as alleged in the information and the date proved at trial is considered reversible error if the defendant shows that her ability to defend against the charge was impaired.  *People v. Adler*, 629 P.2d 569, 571 (Colo. 1981).

¶ 44    King alleges that if the prosecution had charged her with the prostitution and pandering offenses "between and including January 1, 2016, and September 22, 2021," she could have defended on the basis that those charges deprived the trial court of jurisdiction because of the expired statute of limitations.[4]

¶ 45    While we agree that the error was obvious, the error was not substantial for two reasons.

¶ 46    First, the variance did not impair King's ability to defend against the charges.  King's reliance on *People v. Lopez*, 140 P.3d 106 (Colo. App. 2005), is misplaced.  In *Lopez*, the pro se defendant was charged with failing to register as a sex offender on a specific date.  *Id.* at 110.  Lopez argued that he could not physically register

---

[4] At the time of the alleged offenses, prostitution and pandering were both misdemeanors, subject to an eighteen-month statute of limitations.  *See* §§ 18-7-201(3), -203(2)(b), C.R.S. 2021.  The prosecution brought charges on October 5, 2021.

on that specific date because he was in jail and jail officials did not allow him to do so. *Id.* In closing, the prosecutor presented additional dates on which Lopez did not register. *Id.* The court of appeals found that the variance impaired Lopez's ability to defend against the charge because his defense was specific to the charged date, not the additional dates the prosecutor argued in closing. *Id.*

¶ 47 Here, King's defense was that she did not engage in the crimes of prostitution or pandering. She did not provide a specific defense related to the date charged. Therefore, her theory of defense was unaffected by any variance between the date in the information and the date range presented at trial. *See Rail*, ¶ 54. Further, King does not assert that she was surprised by the evidence presented at trial or that she would have produced different evidence in her defense. *See id.*; *People v. Pahl*, 169 P.3d 169, 178 (Colo. App. 2006).

¶ 48 Second, the evidence that King committed prostitution and pandering on or about September 22, 2021, the date in the charging document, was overwhelming. Prostitution requires a person who "performs or offers or agrees to perform any act of sexual intercourse . . . with any person not his spouse in exchange

for money or other thing of value." § 18-7-201(1), C.R.S. 2025. At the party, King agreed to have sex in exchange for money. Further, pandering includes "[k]nowingly arranging or offering to arrange a situation in which a person may practice prostitution." § 18-7-203(1)(b), C.R.S. 2025. White's testimony provided extensive evidence that King agreed to provide women who would have sex in exchange for money at the party, selected the women to attend, arranged their arrival — including transportation — and discussed the sexual acts the women would perform at the party along with the payment they would require. Therefore, the evidence supported King's prostitution and pandering convictions on or around the date charged and within the statute of limitations.

¶ 49 Accordingly, we conclude that any error caused by the simple variance did not undermine the fundamental fairness of the trial.

## V. Rule of Completeness

¶ 50 King next contends that the trial court erred by allowing the prosecution to introduce portions of Chambers' out-of-court interview over her rule-of-completeness objection. Even assuming, without deciding, that an error occurred, we conclude it was harmless.

## A. Additional Facts

¶ 51    In December 2021, Weems conducted a phone interview with Chambers.  Chambers told Weems that Allin was a regular customer and confirmed that she had sex with Allin in exchange for money while working as an independent contractor for King at Sutra Healing Center.  At that time, King took over fifty percent of Chambers' pay.  During the interview, Chambers expressed that the phone call was difficult because she was dealing with "past traumas."

¶ 52    At trial, Chambers testified that she could not remember what she told Weems and denied providing sexual services in exchange for money.

¶ 53    During Weems' testimony, the prosecution sought to admit the interview as a prior inconsistent statement by Chambers.  King objected on hearsay grounds.  After a lengthy discussion, the trial court determined that the interview was admissible.

¶ 54    When the interview was introduced, the prosecutor stated that, in the interest of time, they would not play the full twelve minutes but would skip through a few portions.  The following discussion ensued:

21

> DEFENSE COUNSEL: I think for the sake of completeness, we should just play the 12 minutes.
>
> THE COURT: The Prosecution can play whatever portions they believe are relevant. If you want to, during cross-examination, ask that the entire thing be presented, you can do so.

¶ 55   After Weems verified the audio recording reflected a fair and accurate depiction of his interview with Chambers, the prosecution played four clips.

¶ 56   During cross-examination, King did not request the full interview to be played.

### B.   Standard of Review and Applicable Law

¶ 57   We review a trial court's evidentiary rulings for abuse of discretion. *People v. McLaughlin*, 2023 CO 38, ¶ 22. A trial court abuses its discretion when it misapplies the law or when its decision is manifestly arbitrary, unreasonable, or unfair. *Id.* When, as here, a defendant has preserved her objection to the exclusion, we evaluate any error for harmlessness and will reverse "only if the error substantially influenced the jury's verdict or affected the fairness of the trial proceedings." *People v. Owens*, 2024 CO 10, ¶ 66.

¶ 58     The rule of completeness provides that, "[w]hen a statement or part thereof is introduced by a party, an adverse party may require introduction of any other part or any other statement which ought in fairness to be considered contemporaneously with it."  CRE 106. Its purpose is to "avoid creating a misleading impression by taking evidence out of context or otherwise creating a distorted picture by the selective introduction of evidence."  *People v. Medina*, 72 P.3d 405, 410 (Colo. App. 2003); *see also McLaughlin*, ¶ 31 (the touchstone of a completeness inquiry is fairness).

## C.  Analysis

¶ 59     King argues that the jury was misled because the remaining portions of the interview revealed Chambers' state of mind.  We are not persuaded.  First, neither trial counsel nor appellate counsel explained, beyond conclusory representations, how playing only a portion of the interview created a misleading impression of Chambers' state of mind or how greater context was helpful or fairer.

¶ 60     Second, the entire interview was introduced into evidence. Therefore, the jury had access to, and could have listened to, the entire interview.  *See Owens*, ¶ 66 (error deemed harmless when it

23

did not substantially influence the jury's verdict or affect the fairness of the trial proceedings).

## VI. Authentication of Documentary Evidence and Hearsay Contentions

¶ 61     King next contends that Facebook records, a digital extraction from King's phone, and material from backpage.com (Backpage advertisements) were improperly admitted as evidence. We disagree.

### A. Additional Facts

¶ 62     Regarding the Facebook records, Weems wrote one Facebook search warrant for four separate Facebook accounts. Exhibit 72 is a certificate of authenticity form from Facebook for an account under the name "Thepriestessinitiationsanctuary."[5] Weems testified that the identification number of the certificate of authenticity matched that of the Facebook account that he requested in the search warrant. King admitted to owning the Facebook account. The records showed that the creator name was Shirley Briar Rose

---

[5] In response to a record request search warrant, Facebook sends a certificate of authenticity to verify that records came from Facebook and that the account information provided matches the requested information. Each Facebook account contains an identification number.

24

King. Weems testified that the account listed an email address, multiple credit cards, and a PayPal account associated with King. King objected, arguing that the prosecutor had not laid a sufficient foundation to establish that "The Priestess Initiation Sanctuary" was King's Facebook account. The court overruled the objection and found that Weems' personal knowledge that Exhibit 72 was produced in response to a search warrant was sufficient to authenticate the exhibit under *People v. N.T.B.*, 2019 COA 150.

¶ 63 Exhibits 73-78 are Facebook messages that came from the Facebook account admitted in Exhibit 72. King objected on hearsay and authentication grounds, arguing that the messages contained out-of-court statements from other parties and that the prosecution failed to establish the messages originated from the Facebook account in Exhibit 72. The trial court admitted the exhibits over King's objection, finding that the messages were not offered for their truth but to give context for King's responses and that Weems' testimony established their authenticity.

¶ 64 Exhibit 79 is a certificate of authenticity from Facebook for an account under the name "shirley.king.96." Again, Weems testified that the identification number on the certificate of authenticity

matched that of the Facebook account he requested in the search warrant and that King admitted to owning the Facebook account. Weems said the account listed King's phone number, email, and Sutra Healing Center's address. Exhibits 80-93 consisted of Facebook posts and messages associated with the Facebook account. King objected on authentication and hearsay grounds. The trial court admitted the exhibits over King's objection based on its prior ruling admitting Exhibits 73-78. The trial court then advised the jury:

> [W]ithout going into the details too much of the law of hearsay, statements that are attributed to the defendant are not hearsay. These other statements that are in the – these Facebook postings are hearsay. They're effectively out-of-court statements. I'm allowing them to come in because they give context to any response, but they are not – they can't be considered as truthful. They're just giving context to whatever response that was attributed to Ms. King, or whoever else the responder was, the Sutra Healing Center, on those messages.

¶ 65 Exhibit 94 is a certificate of authenticity from Facebook for an account under the name of "akira.summers."[6] The creator's name

---

[6] Akira Summers is King's known alias.

26

is Akira Summers. The account listed King's phone number, a credit card associated with King, and the current city as Colorado Springs. King renewed her previous objections. After the trial court asked the prosecutor to lay more foundation, Weems testified that photographs of King and advertisements for Sutra Healing Center appeared on the Facebook account. The trial court admitted the exhibit over King's objection.

¶ 66 Exhibits 95 and 96 are records corresponding to this account, including a conversation between "Akira Summers" and another individual that referenced Sutra Healing Center and VIP treatment. At King's request, the trial court again agreed to provide a jury instruction stating that "any context statements within here are admitted, although they are out-of-court statements . . . any other statements are statements that are simply attributed to the account that the Prosecution is submitting is the account of the defendant."

¶ 67 Regarding the cell phone extraction data, records extracted from King's phone were admitted as Exhibits 97-102 and 104-105. Exhibits 97-100 comprised of messages between King's email and Chambers. Chambers testified that she recognized the messages. Exhibits 101-102 and 104 contained additional messages extracted

27

from King's phone. Exhibit 105 was a web search extracted from King's phone. King objected to the admission of the exhibits based on authentication, hearsay, and CRE 403 grounds. The trial court overruled King's objection.

¶ 68 When King was arrested, police seized her cell phone. Detective Bryan Rodgers, a digital forensics detective with the Colorado Springs Police Department who was qualified as an expert in digital forensics, used GrayKey and Cellebrite technology to extract data from King's phone. He described the technology and how it is used to extract data from cell phones and how it generates extraction reports. Specifically, Rodgers explained that once GrayKey extracts the data, Cellebrite identifies the information in the data within the parameters of the search warrant, categorizes it, and makes it easy to view. He confirmed that the cell phone data is not altered by the technology, and that the process involves no human input. Weems testified that the printouts were fair and accurate copies of the messages and web searches he received from the data extraction report.

¶ 69 Finally, the prosecution presented printouts of Backpage advertisements posted from 2015 to 2018. King did not object.

Backpage was a website used for commercial sex advertisements. In 2018, Backpage was seized by the Federal Bureau of Investigation (FBI). As a result, the FBI holds all the data from Backpage servers. Weems requested the Backpage records from the FBI and testified that the Backpage advertisements for Sutra Healing Center included King's phone number. Additionally, King admitted to posting advertisements on Backpage.

¶ 70 Finally, Matt Frost, a digital forensic examiner for the FBI, testified that all the advertisements were posted by King's email address.

### B. Standard of Review and Applicable Law

¶ 71 As we discussed, *supra* Part V.B, we review a trial court's evidentiary rulings for abuse of discretion.

¶ 72 CRE 901 through 903 govern the authentication and identification of objects whose admission into evidence is sought by a party. *People v. Glover*, 2015 COA 16, ¶ 11. Authentication requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a). The standard of authentication is "minimal — all that's required is a prima facie showing that the evidence is what its proponent claims." *Gonzales*

*v. People*, 2020 CO 71, ¶ 42.  Thus, evidence is admissible if "the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic."  *Id.* at ¶ 27 (citation omitted).  Once this burden is met, authenticity is a question for the jury.  *Id.* at ¶ 6.

¶ 73     "Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  Unless an exception applies, hearsay is generally inadmissible.  CRE 802.  But "[u]nder CRE 801(d)(2)(A), a statement made by a party is not hearsay if it is offered against that party."  *Glover*, ¶ 40.  "To admit a statement under this rule, the proponent must prove by a preponderance of the evidence that it was the opposing party who made the statement."  *Id.*

### C.   Analysis

#### 1.   Facebook Records

¶ 74     King contends that the Facebook records were inadmissible on both authentication and hearsay grounds.  Specifically, she argues that insufficient evidence shows that the Facebook accounts

belonged to her and that she authored the messages and posts associated with them. We disagree.

¶ 75    The authentication of Facebook messages requires two showings: (1) that the records are from Facebook and (2) that the communications were made by the purported sender. *Glover,* ¶ 23. The first showing can be established through the testimony of a witness with knowledge or consideration of the distinctive characteristics of the records. *Id.* at ¶ 24. Such evidence may include "testimony regarding how the records were obtained, the substance of the records themselves, and affidavits or testimony from employees of the social networking site." *Id.* at ¶ 26. The second showing requires "additional corroborating evidence of authorship . . . beyond confirmation that the [Facebook] account is registered to the party purporting to create those messages." *Id.* at ¶ 30. This standard is satisfied by testimony establishing any combination of the following factors:

> (1) the account was registered to the purported sender; (2) corroborative evidence showed that the account was used by the purported sender; (3) the substance of the communications was recognizable as being from the purported sender; (4) the sender "responded to an exchange in such a way as to indicate

31

circumstantially that he or she was in fact the author of the communication"; and (5) any other confirming evidence under the circumstances.

*People v. Heisler*, 2017 COA 58, ¶ 12 (citation omitted).

¶ 76    We conclude that the evidence in this case satisfies these requirements. First, the evidence was sufficient to show that the exhibits originated from Facebook. As in *Glover*, Weems testified that he received the records from Facebook in response to the warrant. *Glover*, ¶ 27. As the trial court found, when a law enforcement investigator possesses personal knowledge that proffered evidence was produced in response to a search warrant, courts have allowed the investigator to authenticate that evidence. *N.T.B.*, ¶ 18. For Exhibits 72, 79, and 94, Weems testified that the identification number on the certificate of authenticity matched that of the Facebook account that he requested in the search warrant and that the exhibits were a fair and accurate representation of the records he received from the search warrant.

¶ 77    Second, the evidence was sufficient to support the finding that the Facebook accounts belonged to King and that King made the posts and sent the messages. Weems testified that King's name, or

alias, was associated with each Facebook account as well as various forms of identification, including her phone number, email address, business address, credit cards, and PayPal account. *See Glover*, ¶ 32 (court identified various factors showing the defendant was the author of the messages including that the account was registered to the defendant's name and defendant provided his phone number to Facebook).

¶ 78 Moreover, we reject King's hearsay argument. The exhibits contained nonhearsay statements of a party opponent. Weems' testimony established by a preponderance of the evidence that King made the statements contained in the Facebook exhibits. To the extent that King denied making these statements, that was a matter for the jury to decide. *People in Interest of A.C.E-D.*, 2018 COA 157, ¶ 43.

¶ 79 Under these circumstances, we conclude that the trial court did not abuse its discretion by admitting the Facebook exhibits.

### 2. Cell Phone Extraction Data

¶ 80 Again, King contends the court erroneously admitted the cell phone extraction data on authentication and hearsay grounds.

¶ 81   CRE 901 "does not prescribe any exclusive method for authenticating evidence." *Gonzales*, ¶ 30; *see also Heisler*, ¶ 15 (holding that text messages may be authenticated though "any other corroborative evidence under the circumstances"). The exhibits contained King's phone number, email address, alias, and business name. Further, Chambers testified that she recognized some of the messages as her exchanges with King. It is enough that the evidence, as described above, was such that a jury could reasonably find that the communications were made by King. *Gonzales*, ¶ 27; *see also A.C.E-D.*, ¶ 43 (to the extent defendant denies making these statements, that was a question for the jury).

¶ 82   Moreover, because the evidence shows the cell phone extraction report was automatically generated, it is not hearsay under CRE 801. *See People v. Abad*, 490 P.3d 1094, 1105 (Colo. App. 2021).

¶ 83   Accordingly, we conclude that the trial court did not abuse its discretion in admitting the cell phone extraction data.

### 3. Backpage Advertisements

¶ 84   King contends that the Backpage advertisements were erroneously admitted. We disagree.

34

¶ 85     The prosecution established that the FBI seized Backpage's servers in 2018 and took control of all its data.  Frost, an examiner from the data holder, then confirmed that the records were Backpage data.  Moreover, King's phone number and email were associated with the advertisements and King said in her interview that she posted on Backpage.  This evidence satisfies the requirement imposed by CRE 901(a) that the evidence is what the prosecution claimed.  *See Gonzales*, ¶ 27 (evidence is admissible if "the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic" (citation omitted)).

¶ 86     We also reject King's hearsay argument.  King's reliance on *N.T.B.* is misplaced.  In *N.T.B.*, another division of this court determined that the account number, activity log, and IP address purportedly connecting a Dropbox account to the defendant were not admissible as business records without testimony or an affidavit from custodians showing that the records were created in the regular course of business, inputted accurately within a reasonable amount of time, and transmitted by a reliable person with knowledge.  *N.T.B.*, ¶ 40.  Here, the admission of the Backpage

advertisements was accompanied by testimony from Frost, who testified that the exhibits were Backpage data.

¶ 87     Accordingly, we find that the trial court did not abuse its discretion in admitting the Backpage advertisements.

## VII.   Co-Conspirator Statements

¶ 88     King last contends that the trial court erroneously introduced statements of the women at the party.  We disagree.

### A.   Additional Background Information

¶ 89     As previously described, the women at the party agreed to have sex in exchange for money.  When White testified about his encounter and conversation with one of the women, King objected on hearsay grounds.  The prosecutor argued that the women's statements that they were willing to offer sex in exchange for money were admissible as co-conspirator statements under CRE 801(d)(2)(E).

¶ 90     The prosecutor also argued that there was evidence of a conspiracy independent of the statements: (1) extensive communication between White and King about the nature of the party and organizing it; (2) explicit and implicit communications from King about the women exchanging sex for money; and (3) the

36

fact that the four women arrived at the house for the party together after meeting at the Sutra Healing Center.

¶ 91   The trial court overruled King's objection:

> [T]he court doesn't have to find that a conspiracy in this case exists beyond a reasonable doubt.  It simply has to find that there's a prima facie case of conspiracy.  And based upon the statements from [White] following his first encounter – or, excuse me, I guess it would be his second encounter with King where he engaged in the body slide activity, that they talk about having a party, that he talked about her bringing [the women] to that party to engage in certain type of activities, similar at least to what they engaged in at [Sutra Healing Center], the Court finds that there was a conspiracy.

¶ 92   The court admitted the statements under CRE 801(d)(2)(E).

### B.   Standard of Review and Applicable Law

¶ 93   As discussed, *supra* Part V.B, we review a trial court's evidentiary rulings for abuse of discretion.

¶ 94   Although hearsay statements are generally inadmissible, CRE 802, a statement made by a co-conspirator "during the course and in furtherance of the conspiracy" is not hearsay and, therefore, may be admissible, CRE 801(d)(2)(E); *see People v. Archer*, 2022 COA 71, ¶ 35.  To admit such a statement, the court must find by a

preponderance of the evidence that a conspiracy existed and that the statement was made during the course of and in furtherance of the conspiracy. *Archer*, ¶ 36. In deciding whether a conspiracy existed, the court may consider the statements themselves, "but there must also be some independent evidence establishing that the defendant and the declarant were members of the conspiracy." *Id.* (quoting *People v. Villano*, 181 P.3d 1225, 1229 (Colo. App. 2008)). "This corroborating evidence may take many forms, including circumstantial evidence of the conspiracy . . . or the defendant's own statements." *People v. Montoya*, 753 P.2d 729, 736 (Colo. 1988).

## C. Analysis

¶ 95 We discern no abuse of discretion in the trial court's admission of the evidence under the co-conspirator hearsay exception. In determining that a conspiracy existed, the court relied on (1) the women's agreement to have sex in exchange for money and (2) White's testimony that King arranged for the women to come to the party to perform sexual acts in exchange for money. This evidence is sufficient to establish, by a preponderance of the evidence, that a conspiracy existed and allows for the admission of

the women's statements. *See People v. Esch*, 786 P.2d 462, 464 (Colo. App. 1989).

¶ 96 Moreover, even assuming, without deciding, that the court erred in failing to make explicit findings on the record that the women's statements were made both during the course of and in furtherance of the conspiracy, we conclude that any error was harmless because the record shows that the foundational requirements were met. *See People v. Fuller*, 788 P.2d 741, 745 (Colo. 1990) (district court's failure to make requisite findings for admissibility of hearsay harmless where record supported its admission). Generally, a statement is made during the course of the conspiracy if it precedes the conspirators' attainment of the object of the conspiracy. *See People v. Faussett*, 2016 COA 94M, ¶¶ 39-42. Here, the record shows that the women's statements were made in the course of the conspiracy because the statements were made at the party before the police arrested King and the women.

¶ 97 Alternatively, the "in furtherance" requirement is satisfied by a statement that encourages the co-conspirator or another person to advance the conspiracy, or enhances the co-conspirator's or

another person's usefulness to the conspiracy. *Id.* at ¶ 45. The record shows that the statements were also made in furtherance of the conspiracy because the women said they would have sex in exchange for money. *See id.* at ¶ 47 ("Because the conspirators were not . . . involved in idle chatter or merely a narrative of past events, but rather, were proposing measures to advance the aims of the conspiracy, the statements . . . were properly admitted under CRE 801(d)(2)(E).").

¶ 98    Accordingly, we conclude that the trial court did not abuse its discretion in admitting the women's statements.

## VIII.  Cumulative Error

¶ 99    King contends that if we determine that the trial court erred and that none of the errors individually requires reversal of her conviction, we should nevertheless reverse because of the errors' cumulative prejudicial impact. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. "Stated simply, cumulative error involves cumulative prejudice." *Id.* The relevant inquiry is "whether, viewed in the

aggregate, the errors deprived the defendant of a fair trial." *Id.* at ¶ 4; *see People v. Vigil*, 2024 COA 72, ¶ 48 (explaining that, to determine whether errors are harmless individually or collectively, we must conduct a "case specific assessment of the likely impact of the error[s] in question on the outcome of the litigation as a whole." (quoting *Pernell v. People*, 2018 CO 13, ¶ 22)).

¶ 100 As discussed above, the court made two errors. However, given the nature of the errors, coupled with the overwhelming evidence of King's guilt, "we cannot conclude that the cumulative effect of the errors substantially prejudiced [her] right to a fair trial." *People v. Mendenhall*, 2015 COA 107M, ¶ 82.

IX. Disposition

¶ 101 The judgment is affirmed.

JUDGE PAWAR and JUDGE YUN concur.