23CA1307 Peo v Hunnicutt 02-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1307
Jefferson County District Court No. 21CR1646
Honorable Lily W. Oeffler, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jerald Blaine Hunnicutt,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE WELLING
Tow and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 26, 2026

---

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jerald Blaine Hunnicutt, appeals his judgment of conviction for second degree assault and false imprisonment.  We affirm.

## I.    Background

¶ 2    In June 2021, Hunnicutt and his wife, M.H., lived together with their two children.  At the time, M.H. was pregnant with their third child.  One evening, M.H. called 911 to report that Hunnicutt had tried to kill her by strangling her with a cord.

¶ 3    Police arrived and talked to Hunnicutt, who reported that he and M.H. had gotten into an argument about an affair.  He said that they had begun "[t]ussling" and that he had tried to restrain M.H. so that she would leave him alone and not hurt him.  He said that he had tried to restrain M.H. by tying her up because she was trying to hit him.

¶ 4    Separately, M.H. told police that she had confronted Hunnicutt after she caught him cheating on her.  After the argument turned physical, M.H. tried to escape to a neighbor's house.  But Hunnicutt had blocked the doorway, strangled her with his hands and arms, and then tied her up with a shoelace and tried

to tie her up with plastic wrap. Eventually, M.H. was able to escape to the neighbor's house.

¶ 5    Hunnicutt denied putting his hands around M.H.'s neck, instead repeating that he had only restrained M.H. to protect himself. He said that she had grabbed a machete, but he was able to get it away from her. He denied using plastic wrap but admitted to tying her hands behind her with shoelaces. M.H. had marks on one wrist and her neck.

¶ 6    M.H. was taken to a hospital, where a forensic nurse examiner, Lorna Leader, evaluated her. M.H. told Leader that Hunnicutt had "choked" her, pushed her, hit her with a Swiffer handle, grabbed a knife while pulling her hair, tied her hands behind her back with shoelaces, and stuffed a sock down her throat.

¶ 7    The People charged Hunnicutt with attempted first degree murder, second degree assault (bodily injury with deadly weapon), second degree assault (restrict breathing), and false imprisonment.

¶ 8    At trial, M.H. recanted, asserting that she had attacked Hunnicutt. She denied making the statements mentioned above to the police and Leader. Leader testified to the statements M.H. had

made to her.  The People also called an expert witness who testified about domestic violence, domestic violence relationships, and trauma.  Hunnicutt testified and claimed that he had acted in self-defense.

¶ 9     The jury acquitted Hunnicutt of attempted first degree murder and second degree assault (bodily injury with deadly weapon).  It convicted him of second degree assault (restrict breathing) and false imprisonment.  The trial court sentenced him to twelve years in the custody of the Department of Corrections for the second degree assault and a concurrent jail sentence of 364 days for the misdemeanor false imprisonment conviction.

## II.    Issues on Appeal

¶ 10    Hunnicutt raises four arguments on appeal.  He contends that the (1) the trial court erred when it denied his *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), challenge to the prosecutor's exercise of a peremptory strike; (2) the trial court erred when it admitted expert testimony about typical domestic violence offender behavior, in violation of CRE 702 and CRE 404; (3) the trial court erred by admitting M.H.'s statements to Leader; and (4) the prosecutor committed three instances of reversible misconduct during

Hunnicutt's trial. Hunnicutt also contends that the cumulative effect of these errors requires reversal. We consider each contention in turn below.

## A. *Batson* Challenge

¶ 11    First, Hunnicutt contends that the trial court erred when it denied his *Batson* challenge to a potential juror. We disagree.

### 1. Additional Facts

¶ 12    While conducting voir dire, one of the prosecutors and Potential Juror A had the following conversation:

> [Prosecutor]: So, [Juror A], tell me what you're thinking in terms of this concept of he said she said and your job in determining the credibility of the testimony of witnesses and the stories that you hear in the courtroom.
>
> [Juror A]: Well, you know, it's going to be two different stories, you know. So — at this point in time, unless there's a lot of evidence, how can you be able to tell who's telling the truth?
>
> [Prosecutor]: Right. Well, what would you look for? Why do people lie?
>
> [Juror A]: Get away with — with a crime.

¶ 13    The conversation continued,

> [Prosecutor]: [W]hat about someone who didn't commit a crime? Why would someone who didn't commit the crime lie for someone else?

4

> [Juror A]: I don't know about that. You know,
> if — could you repeat that again.
>
> [Prosecutor]: Yeah. Yeah. Sure. Why would
> someone who didn't commit a crime lie for
> someone who did commit the crime?
>
> [Juror A]: Oh, okay. Yeah. No. They
> shouldn't.
>
> [Prosecutor]: Yeah of course. I mean we
> shouldn't lie, but there could be reasons for it.

¶ 14    The prosecutor then ended her conversation with Juror A and turned to a different prospective juror.

¶ 15    The prosecutor exercised her first peremptory challenge to strike Juror A. In response, defense counsel asked to approach the bench and, outside the potential jurors' hearing, made a *Batson* challenge, noting that Hunnicutt is Black and that Juror A "is the only potential juror in the group of [twenty-five] that has a Spanish surname." The trial court then asked the prosecutor to provide a race-neutral explanation for the strike: "[S]hould the [c]ourt find that yes, [Juror A] is Hispanic, could you respond, then to the challenge that this is possibly the only [Hispanic] person here." The prosecutor provided the following explanation:

> I was not with any notes when I was
> questioning the jurors, and so I can't
> remember specifically what area of law he

struggled answering me with, whether it was the mental health state or whether that was the he said/she said. But there was an answer in there that I did not believe he was essentially answering with an understanding of the concept of the law.

¶ 16    A second prosecutor said that she had taken notes during the voir dire but had left them outside the courtroom. That prosecutor explained to the court that she thought Juror A struggled with "the intent piece." Before taking a short break to allow the second prosecutor to retrieve her notes, the court noted that, "just looking at names" on the prospective juror list, it thought there were other names that were "traditionally Hispanic or Latino."

¶ 17    After returning from a break, the court clarified that other prospective jurors had "Spanish surnames or first names," but it still asked the first prosecutor to explain why she struck Juror A. The prosecutor explained that Juror A wasn't

> able to articulate reasons why someone might have a motive to lie, from our notes, and the reason why that's important is that this is a case in which we expect the victim to testify and to recant, and that that recantation is essentially the dishonesty. And so for jurors to understand that concept is important to the People's case. And that [Juror A] was not following or able to provide potential reasons

6

why someone might lie, that is the race-neutral reason for the request to excuse.

¶ 18     In response, defense counsel noted that he was concerned because Juror A may be Hispanic and that he would "just rest with our *Batson* objection." Defense counsel went on to argue,

> I guess it's possible for counsel to always come up with . . . a generic reason for a preemptory [sic] challenge, but obviously *Batson* is there for a reason, to safeguard the rights of the defendant and safeguard the rights of jurors to sit on cases and participate in the jury service system.

¶ 19     The trial court then made its ruling. As for the first step of its *Batson* analysis, the court explained that it couldn't accept that Juror A was the only Hispanic juror in the venire because "if the [c]ourt is stereotyping surnames, of five other jurors, and we have some jurors who have first names that are commonly associated with other ethnicities as such." The court then moved on to the second step, assuming that Hunnicutt had met his burden at the first step, and considered the prosecutor's race-neutral reason for striking Juror A. The court confirmed the prosecutor's reason for excusal with her, asking if the reason was that Juror A "was unable

to come up with any ideas, explanations, possibilities, as to why someone would lie?"  The second prosecutor responded,

> Yes, that is my recollection, is that [the other prosecutor] was asking jurors, why might somebody lie, why might someone lie either in court or to protect somebody, and [Juror A's] answer, if I recall correctly, was something just like, oh, I have no idea.  So obviously the People's concern is that when we're dealing with issues of he said/she said and changing testimony, the ability to perceive witnesses'[] motives and biases in testifying is important in a case like this.

¶ 20     The trial court then asked that prosecutor to reconfirm that the prosecution had struck Juror A because he couldn't come up with a theory as to why someone may lie.  The second prosecutor confirmed the court's understanding, saying that was "how [she] remember[ed] it" and that she didn't "want to misstate the record, but that is what [she] recall[ed]."  The court then moved on to step three and denied Hunnicutt's *Batson* challenge, finding this "to be a race-neutral reason for striking [Juror A]."

### 2.     Legal Principles and Standard of Review

¶ 21     The Equal Protection Clause of the Fourteenth Amendment forbids a challenge to a potential juror based solely on race. *Batson*, 476 U.S. at 89.  When a party raises a *Batson* challenge,

8

the trial court engages in a three-step analysis to assess the claim. *People v. Wilson*, 2015 CO 54M, ¶ 10.

¶ 22　　First, the opponent of the peremptory strike must allege a prima facie case showing that the striking party struck the potential juror based on race. *Id.* As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied their step-one burden. *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).

¶ 23　　At the second step, the burden shifts to the striking party to provide a race-neutral explanation for striking the potential juror. *Wilson*, ¶ 10. All the striking party must do is provide any race-neutral justification for the strike, regardless of its implausibility or persuasiveness. *People v. Ojeda*, 2022 CO 7, ¶ 24. The opponent is then given the opportunity to rebut the striking party's explanation. *Wilson*, ¶ 10.

¶ 24　　At step three, the trial court must decide the ultimate question: whether the objecting party has established purposeful discrimination. *Ojeda*, ¶ 27. In doing so, the trial court must assess the striking party's actual subjective intent and the plausibility of its nondiscriminatory explanation. *Id.*; *Wilson*, ¶ 10.

9

¶ 25    "On appeal, each step of the trial court's *Batson* analysis is subject to a separate standard of review." *Ojeda*, ¶ 30 (quoting *People v. Rodriguez*, 2015 CO 55, ¶ 13). Step one, implicating a question of legal sufficiency, is reviewed de novo. *Id.* Step two, inquiring into the facial validity of the proponent's stated reason for a strike, is also reviewed de novo. *Id.* Step three, determining whether the opponent of a strike has satisfied that party's burden of proving purposeful discrimination — an issue of fact — is reviewed for clear error. *Id.*

### 3. Analysis

¶ 26    Hunnicutt argues that the trial court erred in its step-three conclusion that he hadn't proved purposeful discrimination. He contends that the prosecutor committed purposeful discrimination in violation of equal protection by using her first peremptory strike to remove Juror A, who appeared to be Hispanic. We aren't persuaded and conclude that the court didn't err by denying Hunnicutt's *Batson* challenge.

¶ 27    Because the trial court "heard the prosecutor's race-neutral explanation and ruled on the ultimate issue of purposeful discrimination," the question of whether Hunnicutt established a

prima facie case at step one is moot.[1] *Wilson*, ¶ 12; *see also People v. Johnson*, 2024 CO 35, ¶ 32 (noting that step one was moot because the trial court continued to step two). Further, step two isn't at issue because the prosecutor offered a race-neutral explanation. *Ojeda*, ¶ 24.

¶ 28 Therefore, we review for clear error the trial court's step-three ruling that Hunnicutt didn't establish purposeful discrimination. *Wilson*, ¶ 10. We defer to the trial court's ruling so long as the record reflects that the trial court weighed all the pertinent circumstances and supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the evidence. *People v. Beauvais*, 2017 CO 34,

---

[1] The People cite *People v. Morales*, 2014 COA 129, ¶ 15, to argue that step one isn't moot and that we can affirm on the grounds that Hunnicutt's *Batson* challenge failed at step one. We aren't persuaded. The division in *Morales* determined that the first step wasn't moot because the trial court ended its analysis at step one. The trial court in *Morales* determined that the defendant hadn't established a prima facie case of discrimination but still gave the prosecutor the option to provide a race-neutral reason for the strike. *Id.* at ¶ 16. The trial court, however, made clear that such an explanation wasn't required, so step one wasn't moot. *Id.* The trial court here offered no such explanation. Instead, it "assum[ed]" that Hunnicutt had established a prima facie case and asked the prosecutor for a race-neutral reason for her strike.

¶ 33. Where a court doesn't supply its own race-neutral reasons, a trial court's ultimate denial of a *Batson* challenge can "be taken as an implicit crediting of the prosecution's reasons and thus survive clear error review." *Id.* at ¶ 27. "Given this deferential standard, reversal is only proper under 'exceptional circumstances.'" *Id.* at ¶ 22 (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008)).

¶ 29     Hunnicutt argues that the prosecutor's reasons for striking Juror A were pretextual because they shifted over time and were refuted by the record. We aren't persuaded.

¶ 30     First, the prosecutors didn't offer shifting explanations for the challenge; rather, they supplied additional details once the second prosecutor had an opportunity to review her notes. Although both prosecutors initially struggled to remember what area of the law Juror A didn't understand, once the second prosecutor retrieved her notes, she cemented her explanation for the strike by noting that Juror A couldn't "articulate reasons why someone might have a motive to lie." We therefore disagree that the record establishes that the prosecutors' reasons shifted over time due to any reason other than the supplementation of the prosecutors' recollections through the notes the second prosecutor took during voir dire.

Instead, the prosecutors merely used the notes to confirm the reason for excusal.

¶ 31     Second, we don't agree that the prosecutor's race-neutral explanation — namely, that Juror A couldn't articulate a reason why someone may lie — was refuted by the record. When asked why people lie, Juror A responded that "[p]eople lie to get away with a crime." So it's true that Juror A did initially provide a reason as to why someone may lie. But the prosecutor then immediately asked why someone who didn't commit the crime may lie for someone else, and instead of providing a reason, Juror A merely proclaimed that someone shouldn't lie in that situation. Therefore, for this particular situation, Juror A didn't articulate a reason why someone may lie, which is consistent with the prosecutor's stated race-neutral reason for striking him. Any "discrepancy between the prosecutor's justification and the record of voir dire . . . reflect[s] a mistaken recollection rather than purposeful discrimination." *Wilson*, ¶ 11.

¶ 32     Accordingly, the trial court's acceptance of the prosecutors' proffered race-neutral reason wasn't clearly erroneous, and

therefore the court didn't err by denying Hunnicutt's *Batson* challenge.  *See id.* at ¶ 23.

### B.  Offender Behavior Expert Testimony

¶ 33     Next, Hunnicutt contends that the trial court reversibly erred when it admitted expert testimony about typical domestic violence offender behavior.  We disagree.

### 1.  Additional Facts

¶ 34     Before trial, the People endorsed Jean McAllister as an expert witness in domestic violence and domestic violence relationships and trauma.  The prosecution disclosed to the defense a seventeen-page summary of McAllister's anticipated testimony.  Hunnicutt then filed a motion to preclude McAllister from testifying, arguing, among other things, that her anticipated testimony violated CRE 702 and CRE 404(b).  Importantly, Hunnicutt contended that McAllister's anticipated testimony amounted to impermissible offender behavior testimony.

¶ 35     After hearing argument from the parties, the trial court ruled that McAllister could testify as an expert but limited her testimony to certain areas consistent with the supreme court's decision in *People v. Cooper*, 2021 CO 69, in which the supreme court

considered when generalized expert testimony is helpful to the jury. The trial court explained that it found "it helpful to look at the *People v. Cooper* case" when it was "working [its] way through this whole idea of what may come out and not come out." The court explained that the supreme court in *Cooper* had said that it was permissible for an expert to talk about "general background information about concepts and principles related to domestic violence."

¶ 36 Explicitly relying on *Cooper*, the trial court ruled that it wouldn't allow McAllister "to testify as to a profile of a particular person [who] would engage in criminal activity." But, like the supreme court in *Cooper*, it would allow the expert to share "general background information about certain concepts and principles here related to domestic violence." It then said that it wouldn't allow her "to say that people who perpetrate domestic violence oftentimes have these characteristics, one, two, three, four, five." But it would allow "some discussion about the kind of power and control that may be exercised commonly in domestic violence relationships."

¶ 37 The court also ruled that McAllister couldn't testify about strangulation or brain chemistry because she didn't have the

appropriate expertise. In conclusion, the trial court again cited *Cooper* and ruled that McAllister could testify to "the general dynamics with regard to power and control, the general dynamics of domestic violence."

¶ 38 On the first day of trial, the trial court again addressed McAllister's testimony. It reiterated that it wouldn't "allow [McAllister] to create a typical profile," and then it went through each page of McAllister's proposed testimony summary to rule on what specifically she could testify to and what she couldn't. The court concluded by again citing *Cooper*, explaining that the supreme court had allowed generalized expert testimony on dynamics of domestic violence, so it was similarly allowing such testimony in this case.

¶ 39 At the beginning of her testimony, McAllister confirmed that she didn't know M.H. or Hunnicutt and that she wouldn't be able to offer any opinion about what actually happened in this case.

¶ 40 Then, when the prosecution sought to have McAllister qualified as an expert, defense counsel objected "to her being certified as an expert and the testimony in all" because it was "an elaborate attempt to improperly bolster or improperly vouch for

[M.H.'s] initial version of events." The court overruled this objection. Thereafter, however, defense counsel didn't object to any of the prosecutor's questions or McAllister's answers.

2. Legal Principles and Standard of Review

¶ 41 Generalized expert testimony is "testimony aimed at educating the jury about general concepts or principles without attempting to discuss the particular facts of the case." *Cooper*, ¶ 1. A trial court's admission of expert testimony is governed by CRE 702, which allows opinion testimony if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." To determine the admissibility of expert testimony, a trial court must consider, among other things, whether the testimony would be helpful to the jury. *Cooper*, ¶ 47.

¶ 42 Further, "[e]vidence of a person's character or a trait of that person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." CRE 404(a). But even though evidence of any other crime, wrong, or act isn't admissible to prove someone acted in conformity with

that character, it may be admissible for another purpose. CRE 404(b).

¶ 43 "We review a trial court's admission of expert testimony for an abuse of discretion and will reverse only when that decision is manifestly erroneous." *Cooper*, ¶ 44 (quoting *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011)). "This is a deferential standard that reflects the superior opportunity a trial court has to assess both the competence of an expert witness and whether that witness's anticipated opinions would be helpful to the jury." *Id.*

### 3. Analysis

¶ 44 Hunnicutt contends that the trial court abused its discretion by admitting expert testimony in violation of CRE 702 and CRE 404. Specifically, he argues that some portions of McAllister's testimony constituted impermissible "offender behavior" profile evidence, were irrelevant and unhelpful to the jury, and encouraged the jury to convict Hunnicutt based on his presumed character. We discern no error.

### a. Preservation

¶ 45 The parties dispute whether the challenge Hunnicutt advances on appeal is preserved. Hunnicutt contends that his pretrial

objection preserved all his appellate challenges to McAllister's testimony. The People, on the other hand, contend that Hunnicutt preserved his CRE 702 argument but didn't preserve his CRE 404(a) argument. We agree and disagree in part with the parties. *See People v. Carter*, 2021 COA 29, ¶ 13 (explaining that an appellate court isn't bound by a party's position or concession regarding preservation).

¶ 46    By filing a pretrial motion seeking to prohibit McAllister from offering any testimony at trial, Hunnicutt preserved his contention that the trial court abused its discretion by entering the pretrial order partially limiting and partially allowing McAllister's testimony. Thus, whether the court's pretrial order constituted an abuse of discretion is preserved for our review. The same can't be said for any argument based on McAllister's testimony beyond the scope specified in the pretrial order. This is because Hunnicutt never objected to McAllister's trial testimony. *See People v. Dinapoli*, 2015 COA 9, ¶ 24 ("[W]hen an opponent acts contrary to a pretrial order, a party must contemporaneously object to preserve an appellate argument that the court should have prohibited the action."). Thus, if we conclude that the court didn't abuse its discretion in its

pretrial order, then we review for plain error any challenge to McAllister's testimony that was actually offered at trial as exceeding the scope of an otherwise appropriate pretrial order.

¶ 47    Based on this, we divide our analysis into two parts — (1) whether the trial court erred by making its pretrial ruling, which we review as preserved; and (2) whether McAllister's testimony during trial exceeded the scope of the pretrial ruling, which we review for plain error.

b.    Pretrial Ruling

¶ 48    First, we address whether the trial court's pretrial ruling violated CRE 702 by permitting McAllister to offer improper expert testimony at trial.  We aren't persuaded that it did.  The court's pretrial ruling carefully tracked what the supreme court had ruled in *Cooper* was permissible testimony by a generalized expert in the dynamics of domestic violence.  *See also People v. Coons*, 2021 CO 70, ¶ 1 (a companion case to *Cooper* also involving a generalized expert offering testimony regarding domestic violence).  In *Cooper* and *Coons*, the supreme court upheld the trial court's decision to permit generalized expert testimony about the power and control dynamic between a victim and offender in the context of domestic

20

violence.  *Cooper*, ¶ 4; *Coons*, ¶¶ 6-7.  In this case, the trial court carefully tailored its pretrial order to allow McAllister to testify to the same dynamic.

¶ 49　　In making its ruling, the trial court was "mindful of the purposes for which [McAllister's] testimony" was offered.  *Cooper*, ¶ 3.  It ruled that McAllister wouldn't be permitted to testify at trial "to a profile of a particular person [who] would engage in criminal activity."  But it ruled that McAllister would be permitted to testify to the general dynamics of domestic violence, including behaviors and personalities that fall into the power and control dynamic, because that would be helpful to the jury, like the testimony at issue in *Cooper* and *Coons*.  So, because the trial court carefully crafted its pretrial ruling to limit McAllister's testimony to what was

allowed by these two cases, we can't say that the court's pretrial order was an abuse of discretion.[2]

¶ 50　　We also disagree with Hunnicutt's contention that the trial court's ruling permitted testimony in violation of CRE 404. The trial court ruled that McAllister couldn't testify regarding a typical domestic violence offender profile, which would have been close to impermissible character evidence. And as a generalized expert — meaning she didn't know anything about the facts of the case or Hunnicutt — she couldn't (and didn't) opine that Hunnicutt had any particular traits. *See Coons*, ¶ 56 (explaining that there was no basis to believe the jury drew improper inferences from the expert's testimony when the expert had no knowledge of the facts of the case). Therefore, the trial court didn't abuse its discretion

---

[2] To the extent that Hunnicutt is arguing that the court's ruling exceeded what was authorized in *People v. Cooper*, 2021 CO 69, and *People v. Coons*, 2021 CO 70, we disagree. Hunnicutt hasn't explained how the ruling exceeded the scope of what the court determined was permissible in these two cases. And we aren't persuaded that the trial court's ruling exceeded the permissible scope because the trial court allowed generalized expert testimony about power and control dynamics in domestic violence relationships, like the supreme court did in *Cooper* and *Coons*. *See Cooper*, ¶ 65; *Coons*, ¶ 49.

under CRE 404 by permitting McAllister to testify as a generalized expert at trial, subject to the limits it provided in its pretrial order.[3]

### c. McAllister's Testimony

¶ 51   Second, to the extent Hunnicutt argues that McAllister's testimony exceeded the scope of the trial court's pretrial ruling, this argument also fails.

¶ 52   As noted before, Hunnicutt didn't contemporaneously object to any of McAllister's trial testimony, so we review this contention for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 53   On appeal, Hunnicutt points to four instances where McAllister's trial testimony was objectionable. First, the prosecutor asked McAllister, "[W]hat kinds of behaviors might we see in someone who is seeking to establish power and control over their partner?" McAllister answered,

> You may see verbal abuse, you may see intimidation, in some cases you see threats. You may see psychological abuse or crazy-making kind of behavior. You often see attempts to economically control a victim. You may see threats against children, pets, other people victims care about. Sometimes you see

---

[3] Although the parties dispute whether this contention is preserved, because we conclude that the trial court didn't err by admitting the expert testimony, we decline to address this disagreement.

victim blaming where the offender tells the victim that they're being harmed because the victim has done something wrong. You may see isolation of the victim, where slowly people limit their contact with other people in their life who could support them or help them get away. And you may see — and sometimes people use a victim's dependance on the offender, either economically or for other reasons, to control a victim. And many times you see this happening over time, and in the research literature, the most dangerous relationships are identified as coercive, controlling relationships, and those are relationships where this kind of pattern of control is used.

¶ 54  Second, the prosecutor asked, "[W]hat does the offender's behavior typically look like with respect to blame and accountability issues in that relationship?" McAllister answered,

[M]ost offenders do what we call externalized placement, that is, they don't take responsibility for their own actions, but they blame others if they have problems in their life. So if they lose jobs regularly, they blame it on their terrible bosses, rather than that there might be a pattern of behavior that keeps getting them fired. In their relationship, they tend to blame any problems on their partner, rather than looking at what they can do to help improve the relationship or whether they're contributing to the problems in the relationship.

24

¶ 55     Third, Hunnicutt points out McAllister's testimony that "offenders often criticize and put down their victims," they "typically escalate their behavior dramatically when they think someone is trying to leave them," and they "often tell victims they're bad parents, they threaten to take the kids."

¶ 56     Fourth, McAllister testified that "[j]ealousy is a component of most often offender behavior . . . .  It is one of the things that can escalate the level of violence . . . because it is one of the things where offenders feel like they have lost control of the person that they feel like they should be able to control."

¶ 57     "We reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).  "Plain error addresses error that is both 'obvious and substantial.'" *Miller*, 113 P.3d at 750 (quoting *People v. Stewart*, 55 P.3d 107, 119 (Colo. 2002)).  In addition, "[p]lain error assumes that the [trial] court should have intervened sua sponte because the error was so obvious." *People v. Petschow*, 119 P.3d 495, 505 (Colo. App. 2004).

¶ 58    We aren't convinced that any of McAllister's testimony so obviously violated the court's pretrial ruling such that the court should have intervened sua sponte. *Scott v. People*, 2017 CO 16, ¶ 16 ("To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection."). As noted above, the trial court's pretrial ruling carefully tracked the supreme court's decision in *Cooper*. And the four instances of potentially problematic testimony that Hunnicutt cites didn't obviously exceed the scope of the testimony about power and control dynamics within domestic violence relationships that the supreme court permitted in *Cooper*. *See Cooper*, ¶¶ 63-65 (allowing testimony about a "Power and Control Wheel" that included acts such as "intimidating the victim, using children, and controlling finances" because the theme of the expert's testimony was "the dynamic of power and control as the defining characteristic of an abusive intimate relationship").

¶ 59    Further, we aren't persuaded that any error, even if obvious, substantially undermines our confidence in the verdict. *See Hagos*, ¶ 14. McAllister's testimony spanned almost forty transcript pages and focused largely on a domestic violence victim's behavior and

response, consistent with the trial court's limitations on McAllister's testimony specified in its pretrial ruling. And because McAllister wasn't familiar with the facts of the case, she didn't testify that Hunnicutt had certain offender qualities. Also, as noted below, at least five prosecution witnesses corroborated M.H.'s initial report that Hunnicutt had assaulted her. So given the weight of the evidence against Hunnicutt, any error didn't so undermine the fundamental fairness of Hunnicutt's trial as to cast serious doubt on his conviction. *See id.*

¶ 60    Hunnicutt argues that *Salcedo v. People*, 999 P.2d 833 (Colo. 2000), requires a different result. In *Salcedo*, the defendant was charged with unlawful possession and intent to distribute a controlled substance after he had been caught with a suitcase of cocaine at the airport. *Id.* at 834-35. The primary issue at trial was whether the defendant knew the suitcase he was carrying contained drugs. *Id.* at 841. At trial, an expert opined that the defendant must have known that the suitcase contained cocaine because the defendant fit the profile of a drug courier. *Id.* at 836. The supreme court explained that the trial court abused its discretion by allowing an expert to testify about a typical drug courier profile. *Id.* at 841.

Hunnicutt argues that the supreme court's concerns in *Salcedo* extend beyond the drug courier context to domestic violence dynamics.

¶ 61    *Salcedo* is distinguishable. The expert in *Salcedo* wasn't a generalized expert; instead, he testified as both a fact witness and expert witness. *Id.* at 840. Based on this, the supreme court observed that this "intermingled" testimony "posed a risk of misleading the jury to believe that Salcedo exhibited all of the behaviors and characteristics in [the expert's] profile." *Id.* Here, however, because McAllister testified as a generalized expert, with no knowledge regarding the facts of the case, there wasn't a similar risk that her expert testimony would intermingle with factual testimony and mislead the jury.

¶ 62    Further, we disagree with Hunnicutt's argument that the concerns in *Salcedo* should extend beyond a drug courier profile. The supreme court explained that "[d]rug courier profiles are broad in their sweep and sometimes appear dependent on seemingly contradictory behaviors and characteristics." *Id.* at 839. Also, the supreme court noted that drug courier profile behaviors tend to be commonplace among law abiding citizens, who also "frequently

28

wear crosses, do not wear wristwatches, travel in blue jeans, and decide not to bring books, magazines, or carry-on luggage on planes." *Id.* Because the characteristics of domestic violence abusers are neither contradictory nor commonplace, we don't share the same concerns about generalized domestic violence expert testimony that the supreme court expressed in *Salcedo* regarding expert testimony concerning drug couriers.

¶ 63 Accordingly, we conclude that the trial court didn't abuse its discretion by admitting McAllister's generalized expert testimony regarding domestic violence relationships and dynamics.

## C. M.H.'s Statements

¶ 64 Hunnicutt's next argument involves two separate contentions: that the trial court erred by (1) admitting a document containing the recorded recollection of M.H.'s statements to Leader marked as Exhibit 28 at trial; and (2) failing to guard against the use of the exhibit during jury deliberations, thus prejudicing Hunnicutt. While we agree that it was error for the trial court to admit the exhibit, we conclude that the error was harmless. Because of our conclusion, we don't reach Hunnicutt's second contention.

## 1. Additional Facts

¶ 65    After M.H. called 911, she was taken to a hospital, where Leader evaluated her.  During that examination, Leader took handwritten notes documenting M.H.'s statements to her verbatim.  Before trial, Hunnicutt filed a motion to exclude the notes, arguing that they were all testimonial and that not all of them fit into the medical diagnosis hearsay exception under CRE 803(4).  During a pretrial hearing, the trial court ruled that a portion of the notes could come in at trial, finding that some — but not all — of the statements in the notes fit within the medical diagnosis exception.

¶ 66    Leader testified at trial and the prosecution requested that her notes be admitted as an exhibit.  Hunnicutt objected, explaining that

> we think if the notes come into evidence as an exhibit, it's going to be too persuasive to the jury, as far as instead of the jury trying to recall the statements of [M.H.], both from her testimony, or the various statements of hers that were allowed in as various hearsay exceptions, the jury will then just rely on the — Ms. Leader's notes as the primary source of what [M.H.'s] claims were back in June 2021.

¶ 67     The prosecutor responded, "[S]o this document is really no different than a body-worn camera being admitted, where the jury can go back and review exactly what [M.H.] said.  This document is admissible, it is impeachment evidence, it comes in under [CRE] 611 [sic], it is a hearsay exception for medical treatment."

¶ 68     The trial court overruled Hunnicutt's objection.  It admitted seven pages of Leader's handwritten notes — including the pages that recorded verbatim what M.H. told Leader — into evidence as Exhibit 28.  It also allowed Leader to read her notes aloud to the jury.  Ultimately, because the trial court admitted the physical copy of her notes as Exhibit 28, the jury had access to the notes during its deliberations.

### 2.     Legal Principles and Standard of Review

¶ 69     We review evidentiary rulings for an abuse of discretion. *People v. Miller*, 2024 COA 66, ¶ 40.  If we conclude that the court erred, we review preserved nonconstitutional trial errors for harmless error.  *Hagos*, ¶ 12.  "[W]e reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'"  *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).  When we assess the harmlessness of admitting

31

evidence, "we consider a number of factors, including the importance of the evidence to the prosecution's case; whether the proffered evidence was cumulative; the presence of other evidence corroborating or contradicting the point for which the evidence was offered; and the overall strength of the state's case." *People v. Faussett*, 2016 COA 94M, ¶ 54 (citations omitted).

¶ 70    CRE 802 generally provides that hearsay isn't admissible.  But two exceptions to this rule are relevant here.  CRE 803(4) allows the admission of hearsay statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  And CRE 803(5) permits the admission of "[a] past recollection recorded" if the declarant "(A) can identify the memorandum or record, (B) adequately recalls the making of it at or near the time of the event, either as recorded by the witness or by another, and (C) can testify to its accuracy."  But CRE 803(5) further provides that "[t]he memorandum or record may be read into evidence but may not

itself be received *unless offered by an adverse party*." (Emphasis added.)

### 3. Analysis

¶ 71 Hunnicutt contends that the trial court erred by admitting the writing containing the recorded recollection of M.H.'s statements to Leader into evidence because, under CRE 803(5), the record — Leader's notes — may not be admitted into evidence unless offered by an adverse party. We agree that the court erred.

### a. Preservation

¶ 72 The parties disagree whether Hunnicutt preserved this issue. "Although we do not require "'talismanic language" to preserve particular arguments for appeal,' a party must present the trial court with 'an adequate opportunity to make findings of fact and conclusions of law' on the issue." *Martinez v. People*, 2015 CO 16, ¶ 14 (citations omitted). We conclude that Hunnicutt's objection was sufficient to preserve this issue.

¶ 73 Hunnicutt objected to the prosecution's request to admit Leader's notes as an exhibit. The objection was sufficient to put the trial court on notice that Hunnicutt objected to the admission of the physical notes, and not just their contents. Defense counsel said

he was concerned that, if the notes were admitted, the jury would rely on them "instead of trying to recall the statements of [M.H.]." Therefore, Hunnicutt provided the court with a sufficient opportunity to rule on his objection to the admission of the notes, and not just to their contents being read to the jury. This issue, therefore, was preserved.

### b. Whether the Court Erred

¶ 74 The People argue that, because M.H.'s statements to Leader satisfied CRE 803(4), whether they also satisfied CRE 803(5) doesn't matter. We disagree.

¶ 75 The People cite *Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 43 n.9, to support their argument that, because the notes were properly admitted under CRE 803(4), it is immaterial whether they were also admissible under CRE 803(5). But in *Kelly*, the trial court had two rationales for admitting the hearsay evidence — CRE 803(4) and CRE 807. *Id.* So once the supreme court determined that the exhibit was properly admitted under one hearsay exception, it didn't need to consider whether the trial court had properly admitted it under the other.

¶ 76    Exhibit 28 poses a different evidentiary challenge.  In contrast to the evidence at issue in *Kelly*, Exhibit 28 contains two levels of hearsay — the statements in the document and the document itself — and each level of hearsay must satisfy its own exception to be properly admitted.  *See* CRE 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

¶ 77    The first level of hearsay is M.H.'s statements to Leader.  These statements are governed by CRE 803(4).  Neither party contends otherwise.  So the court properly permitted Leader to read the notes to the jury under this hearsay exception.

¶ 78    The second level of hearsay is the physical document containing Leader's handwritten notes of M.H.'s statements to her, Exhibit 28.  Therefore, whether Exhibit 28 was admissible as a physical document raises separate issues.  Put differently, CRE 803(4) allowed Leader to read her notes to the jury, but it didn't allow the trial court to admit Exhibit 28 as evidence.  The trial court needed another hearsay exception for that.

¶ 79    Exhibit 28 was a past recollection that was recorded verbatim at the time Leader spoke with M.H. Leader also confirmed that the document was a "fair and accurate representation of [M.H.'s] statement to [her]." Therefore, Exhibit 28 satisfied the threshold requirements of CRE 803(5). But it's also subject to the limits of CRE 803(5). That is, the trial court could only have admitted it if Hunnicutt, and not the prosecution, had offered it into evidence. Because he didn't, the trial court erred by admitting Exhibit 28.

### c. Harmlessness

¶ 80    Because Hunnicutt preserved his objection to the admission of Exhibit 28, we review for harmless error. *Hagos*, ¶ 12. We conclude that the error was harmless for two reasons.

¶ 81    First, M.H.'s statements to Leader weren't the only evidence the jury heard regarding M.H.'s original accusations against Hunnicutt. The jury also heard her 911 call in which she said that Hunnicutt had assaulted her. Moreover, a neighbor testified that he saw M.H. running across the street "look[ing] terrified" and saying "he's trying to kill me, he's trying to beat me." In addition, another neighbor, one responding deputy, and an investigator with the sheriff's office all spoke to M.H. on the evening of the incident

36

and testified to what she told them, including that Hunnicutt had assaulted her. So Leader's notes weren't the only evidence corroborating M.H.'s initial story.

¶ 82 Second, Exhibit 28 was necessarily cumulative of Leader's own testimony, at least to some degree. *See People v. Caldwell*, 43 P.3d 663, 668 (Colo. App. 2001). This is because, during her testimony, Leader read the entire contents of Exhibit 28 to the jury. And Hunnicutt doesn't contend that her reading the exhibit aloud to the jury was improper. We are, however, cautious about putting too much weight on this particular aspect of cumulativeness given that whenever a court errs by admitting a document containing a recorded recollection over the opposing party's objection, the admission of the document is always cumulative of a witness's reading of the document.

¶ 83 Still, Hunnicutt contends that the admission of the document itself — and the jury's unfettered access to it during deliberations — brings with it particularly acute prejudice. Indeed, all Hunnicutt's arguments as to why it was improper for the trial court to give the jury unfettered access to Exhibit 28 apply with equal — if not

greater — force in service of his contention that the error in admitting the document wasn't harmless.

¶ 84    Specifically, Hunnicutt contends that the notes — because they are a verbatim transcription of M.H.'s description of the crime — are testimonial and, therefore, their admission is particularly prejudicial.  In support of this contention, Hunnicutt cites *People v. Jefferson*, 2017 CO 35; *DeBella v. People*, 233 P.3d 664 (Colo. 2010); and *Frasco v. People*, 165 P.3d 701 (Colo. 2007), in which the supreme court addressed the need for a trial court to exercise discretionary control over the jury's access to properly admitted testimonial exhibits during deliberations.  In each of these cases, the supreme court discussed the potential prejudicial effects of giving the jury unfettered access to video-recorded interviews of a child sexual assault victim.  *See Jefferson*, ¶¶ 44-53 (concluding that it was an abuse of discretion for the court to give the jury "unfettered access" to a video recording of the child victim's forensic interview); *DeBella*, 233 P.3d at 668-69 (concluding that, given "the nature of the video and its importance to the resolution of the trial," it was reversible error for the trial court to give the jury "unencumbered access" to the video recording of the child victim's

forensic interview); *Frasco*, 165 P.3d at 705 (finding no abuse of discretion in the court permitting the jury to have unfettered access to a video recording of the child victim's forensic interview where "the defendant has alleged nothing about the particulars of the videotape that would likely render its review during deliberations unfairly prejudicial").

¶ 85    We, however, aren't persuaded that granting the jury access to Leader's handwritten notes was incrementally prejudicial in the same way as having access to a video recording of a child's forensic interview in a child sexual assault case. We don't share the same concern present in these cases — that the jury would place undue emphasis on the recording of the child's statement because it "effectively puts the witness in [the jury] room during deliberations" — because the handwritten document containing M.H.'s statements to Leader didn't effectively put M.H. in the jury room like a video recording would have done. *Rael v. People*, 2017 CO 67, ¶ 22 (citing *Jefferson*, ¶ 45); *see also id.* at ¶ 23 (concluding that the same concerns of undue emphasis from *DeBella* didn't apply to a crime scene video exhibit because the video was "more like a non-testimonial, tangible exhibit").

¶ 86     Again, Leader had already read the document into evidence, so the document didn't contain any new information that the jury hadn't heard already.  And although it was error for the court to admit Exhibit 28 into evidence, given the nature of the document — that it was handwritten notes and not a video or audio recording — and that it was cumulative of other, properly admitted evidence, we are persuaded that the error in admitting Exhibit 28 was harmless.

## D.     Prosecutorial Misconduct

¶ 87     Hunnicutt next contends that his judgment of conviction must be reversed due to prosecutorial misconduct throughout the trial. We aren't persuaded.

### 1.     Legal Principles and Standard of Review

¶ 88     When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's challenged conduct was improper based on the totality of the circumstances and, second, whether such conduct warrants reversal applying the appropriate standard of reversal.  *Id.*

¶ 89     If the defendant contemporaneously objected and the error isn't of constitutional magnitude, we subject the prosecutor's

misconduct to general harmless error review. *Id.* at 1097. But if the defendant failed to contemporaneously object to the prosecutor's misconduct — whether the misconduct implicates a constitutional right or not — we review for plain error. *Id.*; *see Hagos*, ¶ 14. Prosecutorial misconduct constitutes plain error only if it's "'flagrant or glaringly or tremendously improper' and so undermine[s] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. Carian*, 2017 COA 106, ¶ 52 (quoting *People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005)).

### 2.    Analysis

¶ 90    Hunnicutt contends that the prosecutor engaged in three instances of misconduct during the trial. We address each below.

### a.    Expert Testimony

¶ 91    First, Hunnicutt contends that the prosecutor committed reversable misconduct when she deliberately elicited inadmissible and prejudicial expert testimony during her questioning of McAllister. Specifically, Hunnicutt points to the prosecutor's question, "And what kinds of behaviors might we see in someone who is seeking to establish power and control over their partner?"

41

Hunnicutt also contends that the following question by the prosecutor constituted misconduct:

> I want to talk to you a little bit about some of the dynamics of domestic violence and typical victim and offender behaviors within those relationships. So I think we talked about control being kind of central to the domestic violence relationship. In your expertise, what does the offender's behavior typically look like with respect to blame and accountability issues in that relationship?

¶ 92    Hunnicutt asserts that these questions constituted prosecutorial misconduct because, by asking the questions, the prosecutor sought to elicit inadmissible testimony about offender behavior, despite knowing that doing so would violate the court's pretrial ruling on the parameters of McAllister's testimony. The People respond that the prosecutor didn't commit misconduct through her questioning because her questions to McAllister were within the scope of the trial court's pretrial ruling.

¶ 93    As with the challenge to the admissibility of McAllister's testimony, the parties disagree whether this issue is preserved. Hunnicutt contends that his pretrial motion to restrict McAllister's testimony and his trial objection to her qualification as an expert preserved his prosecutorial misconduct claim. It didn't. After the

42

prosecution tendered McAllister as an expert, Hunnicutt objected to "her being certified as an expert and the testimony in all." But he didn't object to either of the above questions by the prosecutor, and we aren't persuaded by Hunnicutt's argument that his general objection to McAllister's expert testimony extends to objecting to these particular questions by the prosecutor. His general objection to McAllister's testimony as an expert didn't "draw[] the court's attention" to any alleged prosecutorial misconduct (and couldn't have, given that he made it long before trial started). *People v. McFee*, 2016 COA 97, ¶ 31. Put differently, by objecting to McAllister as an expert, Hunnicutt wasn't also objecting to this issue of prosecutorial misconduct. Moreover, the court didn't have an opportunity to rule on his objection as to prosecutorial misconduct. *See People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004). Therefore, we review any misconduct by the prosecutor for plain error.

¶ 94 Turning to the merits of Hunnicutt's prosecutorial misconduct contentions, these questions weren't a clear violation of the trial court's pretrial ruling on the scope of McAllister's testimony. The trial court ruled that it "wouldn't allow a profile," but that McAllister

could testify that, "within the concepts of [the] general dynamics, certain behaviors or personalities . . . may fall into this control or power dynamic." We can't say that these questions obviously or clearly ran afoul of this ruling. And even if the questions did amount to misconduct because they violated the court's pretrial ruling, they weren't so "flagrant or glaringly or tremendously improper" as to call into question the fundamental fairness of the entire trial. *Cevallos-Acosta*, 140 P.3d at 122.

¶ 95 Accordingly, the prosecutor didn't commit reversible misconduct during her examination of McAllister.

### b. Character Evidence

¶ 96 Second, Hunnicutt contends that the prosecutor committed reversible misconduct when she elicited irrelevant and prejudicial character evidence during her cross-examination of Hunnicutt.

¶ 97 Hunnicutt testified at trial. During the prosecutor's cross-examination of him, she confirmed that he had a prior conviction involving domestic violence. She also asked him, (1) "[I]s it fair to say that you're not a fan of law enforcement?" and (2) "[Y]ou have a tattoo that says, fuck the feds, on your arm; correct?" Hunnicutt didn't object to any of these questions. Hunnicutt now contends

44

that the prosecutor committed misconduct by asking him these questions.

¶ 98 The parties agree that this issue isn't preserved. We therefore review any misconduct for plain error.

¶ 99 We disagree that it was misconduct to ask about his prior domestic violence conviction because the trial court had ruled before trial that the prosecutor could ask certain questions about this prior conviction, including eliciting that it involved domestic violence. *Cf. People v. Garner*, 2015 COA 175, ¶ 33 (concluding that it wasn't improper for the prosecutor to ask questions in reliance of a limiting instruction), *aff'd*, 2019 CO 19. But we agree that it was misconduct for the prosecutor to ask Hunnicutt about his tattoo and his views on law enforcement because these questions weren't relevant to any material issue in the case. *See* CRE 401; *see also People v. Fortson*, 2018 COA 46M, ¶ 14 ("It is . . . improper for a prosecutor to purposefully ask a question which he or she knows will elicit an inadmissible answer.").

¶ 100 But again, we can't say that the prosecutor's questions to Hunnicutt about his tattoo and his views of law enforcement were so "flagrant or glaringly or tremendously improper" as to call into

question the fundamental fairness of the entire trial. *Cevallos-Acosta,* 140 P.3d at 122 (quoting *People v. Salyer*, 80 P.3d 831, 839 (Colo. App. 2003)). These were only two questions at the end of a cross-examination that spanned eighteen transcript pages. This didn't so undermine Hunnicutt's credibility to the jury as to affect the fundamental fairness of the entire trial.

¶ 101 Accordingly, the prosecutor didn't engage in reversible misconduct by eliciting irrelevant and prejudicial character evidence.

### c. Opining on Witness Veracity

¶ 102 Last, Hunnicutt contends that the prosecutor committed reversible misconduct when she opined on witness veracity during her opening statement and closing argument. The parties agree that this issue isn't preserved. We therefore review any misconduct for plain error.

¶ 103 During the prosecutor's opening statement, she explained to the jury that

> [i]t's very possible that [M.H.] takes the stand and tells you accurately what happened on June 24th of 2021, just as she did to [Leader], to the police officers she spoke to, to the 911 dispatcher. It is also entirely possible that

46

[M.H.] takes the stand and gives you an entirely different version of events. She might tell you that nothing happened. She might tell you that something different happened. She might tell you that it was her fault.

¶ 104 And during her closing argument, the prosecutor reminded the jury that McAllister had testified that "victims recant, and certainly M.H. recanted on the stand," and then she told the jury that M.H. "recanted her story and she stayed with the defendant." As for Hunnicutt, the prosecutor said that "he explained what he could not deny and denied what he could not explain. He explained all these pieces of physical evidence that are really indisputable. He denied everything else. He denied everything that you could not see because you were not there."

¶ 105 In her rebuttal closing, the prosecutor said that M.H.'s "statement in this courtroom, when she swore that oath, this was not an exercise for her in truth telling" and that M.H. "didn't tell you the truth when she came into this courtroom." She then concluded by saying that M.H. and Hunnicutt were "honest about some things and dishonest about some things."

¶ 106    Hunnicutt contends that these comments crossed the line into impermissible personal opinion on M.H.'s and Hunnicutt's veracity. We aren't persuaded.

¶ 107    Our supreme court has drawn distinctions between a prosecutor's use of the word "lie" versus "did not tell you the truth." *See Domingo-Gomez v. People,* 125 P.3d 1043, 1051 (Colo. 2005); *Wilson v. People,* 743 P.2d 415, 420-21 (Colo. 1987).  Indeed, it's "improper for a lawyer to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar." *Domingo-Gomez,* 125 P.3d at 1050 (quoting *State v. Locklear,* 241 S.E.2d 65, 70 (N.C. 1978)).  But the prosecutor didn't say that M.H. or Hunnicutt "lied."  Instead, she said they were dishonest and "didn't tell you the truth."  We therefore "review [these] comments that potentially expose the prosecutor's personal opinion on the veracity of witness statements in the context of the argument to determine whether they improperly express personal opinion." *Id.* at 1051.

¶ 108    This case turned on the credibility of the witnesses, who provided competing stories.  The jurors had to decide whom to believe.  The prosecutor's comments "argue[d] from reasonable

inferences anchored in the facts in evidence about the truthfulness of a witness' testimony" because McAllister testified as to why a domestic violence victim may recant and how trauma can affect someone's memory. *Id.*

¶ 109 Accordingly, while the prosecutor's language may have veered close to expressing a personal opinion, reviewing the statements in context, the statements didn't cross the line into improper personal opinion. *See id.* at 1051-52 (concluding that the prosecutor's statements to the jury that the defendant "did not tell you the truth" and he "was not truthful with you" weren't improper expressions of personal opinion because the facts in evidence supported an inference that the defendant's testimony was false (emphasis omitted)).

## E. Cumulative Error

¶ 110 Finally, Hunnicutt contends that the cumulative effect of the errors by the trial court and prosecutor require reversal. We have determined that two trial errors occurred: (1) the trial court erred by admitting Exhibit 28 and (2) the prosecutor committed misconduct by improperly adducing character evidence during her cross-examination of Hunnicutt. We also assumed that some of the

questions to McAllister may have been improper. But these errors, even when viewed in combination, didn't substantially prejudice Hunnicutt's right to a fair trial. *See Howard-Walker v. People*, 2019 CO 69, ¶ 26 (holding that "reversal is warranted [for cumulative error] when numerous errors in the aggregate show the absence of a fair trial, even if individually the errors were harmless or did not affect the defendant's substantial rights"); *People v. Martinez*, 2020 COA 141, ¶ 89 (concluding that, even though the division identified two errors, there was no reversible cumulative error because those errors didn't substantially prejudice the defendant's right to a fair trial).

¶ 111 These two errors, plus the prosecutor's assumed misconduct, were discrete errors that didn't have a compounding effect on the fairness of the overall trial. The first error was in the context of M.H.'s statements to Leader alleging that Hunnicutt had assaulted her. And although the prosecutor's questions to McAllister inquired about domestic violence offender behavior, McAllister's testimony in response primarily focused on nonviolent traits of domestic violence abusers. Further, the second error concerned Hunnicutt's personal beliefs about law enforcement (rather than, for example, his

character for violence). So we conclude that the cumulative effect of these errors on Hunnicutt's trial was slight, especially considering the other evidence the prosecution presented that corroborated M.H.'s statement to Leader. *See People v. Vialpando*, 2022 CO 28, ¶ 46 (explaining that, when viewing five errors "in the aggregate and against the backdrop of other evidence, they did not deprive [the defendant] of a fair trial"). Accordingly, we conclude that there wasn't cumulative error.

### III. Disposition

¶ 112    The judgment is affirmed.

JUDGE TOW and JUDGE LIPINSKY concur.